[No. 64471-3. En Banc.]
Argued January 22, 1997.    Decided August 7, 1997.

*In the Matter of the Marriage of* EDMUND W.
LITTLEFIELD, JR., *Respondent,* and CHARISSA L.D.
LITTLEFIELD, *Appellant.*

40

*Edwards, Sieh, Hathaway, Smith, & Goodfriend, P.S.*, by *Catherine Wright Smith* and *Howard M. Goodfriend*; and *Cynthia Whitaker*, for appellant.

*Frank W. Birkholz* and *V. Lee Rees*; and *Charles K. Wiggins*, for respondent.

Guy, J. — The issue in this appeal is whether a trial court entering an initial parenting plan has authority to order the primary residential parent of a child to live in a particular geographic area in order to facilitate frequent contact between the child and the other parent. We hold that under the Parenting Act of 1987, Laws of 1987, ch. 460, a trial court has no such authority. We also hold that a trial court is not bound by parenting plan provisions contained in a prenuptial agreement. Accordingly, we affirm in part and reverse in part.

## FACTS

This action concerns the postdissolution parenting of the five-year-old daughter of Edmund and Charissa Littlefield.

Edmund and Charissa met in May 1989 at a music festival in California, when Edmund was 40 years old and Charissa was 23. Edmund was married but in the process of separating at the time. Charissa had never been married.

Both Edmund and Charissa grew up in California and their families continue to live in California. Edmund is the beneficiary of one trust fund valued at $54 million and

another valued at more than $9 million. His annual income for 1995 was approximately $1.2 million in interest earnings. At the time he and Charissa met, Charissa had a guitar, a pickup truck, her clothing, and some furniture.

Edmund and his first wife had a son who was eight years old at the time their marriage was dissolved in November 1990. The parenting plan entered in that dissolution proceeding restricted Edmund's contact with his son to supervised visits lasting from one to four hours every two weeks. Edmund also was restricted from using drugs or alcohol during any visitation and was to remain in substance abuse counseling.

Because of the problems encountered in his first dissolution action, Edmund and Charissa entered into a prenuptial contract on August 7, 1991, three days before they were married. Most of the provisions of the contract relate to financial matters. Paragraph 18 and part of paragraph 19, however, involve parenting arrangements for any future children the couple would have. Paragraph 18 states:

> Charissa and Edmund believe that any child they have will benefit from the full involvement of both parents. Both believe that it is not in the best interest of the child to become engaged in psychiatric evaluations or protracted disagreements over parenting plans. Accordingly, their children shall spend equal residential time with both parents. How the time is divided shall be determined by the conditions then prevailing, including the age of the children, work schedules of the parents, and other relevant factors. Holidays and birthdays shall be alternated. Major decisions pertaining to the children, including education, religion and military service shall be made jointly. The child's feelings and wishes will be considered in the decision.

Ex. 3.

Paragraph 19 provides, in part, that if the couple had a child and later separated, Edmund would provide a suitable house for Charissa and the child. The contract

discusses the rent, lease or purchase of a house and then states:

> The home shall be selected after consultation by both of the parties, but in the event they cannot agree, Charissa's decision shall be final, provided that the value of the home shall not be more than one and a half times the mean sale price of homes for that portion of the city of Seattle located north of the ship canal to the northerly city limits at 145th street during the twelve month period immediately preceding purchase or lease. . . . The intent of this provision is to provide a nice house if the parties have any children, but not a luxurious or fancy house in the best neighborhood.

Ex. 3.

At the time the agreement was signed, the couple did not know that Charissa was in the early stages of pregnancy. Their daughter, Heather, was born in California on April 29, 1992.

During their marriage, the Littlefields spent several months each year in northern California. They also spent several months each year on Edmund's farm near Arlington, Washington.

Edmund is a member of a band, and he operates a recording studio which is incorporated under the name of Sage Arts, Inc. This recording business has operated at a loss of more than $275,000 per year for several years. Edmund's income from his trusts has been the sole support of his lifestyle, the acquisition of his farm in Arlington, his recording business and his other assets. The farm is not run as a business and generates no income.

The couple separated in July 1994, when Heather was two years old. Charissa and Heather spent the next six weeks in California and Hawaii and moved into a house in Seattle in September 1994, the same month that the petition for dissolution was filed.

In the spring of 1995, Charissa decided to move to California. She testified that she was very unhappy living in Seattle and that she missed the support of her family and

friends in California. No temporary parenting plan had been entered at the time of the move.

Edmund had no objection to the move during May, June or July, as he was performing with his band in California during those months and saw the child frequently. The child spent most of August on the farm with her father. In September 1995, Charissa suggested that Edmund fly to California to spend a week with Heather and then Heather could fly to Washington to spend a week with Edmund in October. Edmund is able to spend private time with Heather at his brother's pony ranch in northern California.

It was not until April 1996, shortly before trial began, that temporary orders were requested. At that time, Edmund began insisting that Charissa return to Seattle to live.

The trial court appointed a psychologist to evaluate the situation and make a recommendation to the court. The psychologist filed a parenting evaluation report, exhibit 2, and testified at trial. The psychologist testified that Charissa had been the primary parent for Heather since the separation, and she did not recommend that Edmund be designated as primary parent because he was not as well suited for that role as Charissa.

The psychologist testified that both parents were immature and neither was well suited to take on the responsibility for raising a youngster, as "[b]oth Ed and Charissa appear to have significant difficulty putting anyone's interests ahead of their own needs." Ex. 2 at 16. She stated that Edmund's farm was not a particularly child-friendly, or even a safe, environment for a preschooler.

The psychologist recommended that "Charissa should be the primary custodial parent for Heather." Ex. 2 at 19. She also recommended that "Ed should have frequent, but brief visits with Heather." Ex. 2 at 19. These visits, she said, should be three or four days of each week. In order to accomplish this schedule, she recommended that

Charissa be ordered to move back to Seattle and to live no more than one hour away from the farm in Arlington.

The psychologist testified that she thought it would be more difficult for Edmund to move to California than for Charissa to move to Seattle because of his business and because Charissa "has only a year's worth down there at this point." Report of Proceedings at 51. She also testified that she based her recommendation on the fact that Charissa was the more adaptable of the two adults and that she had more psychological strengths.

The trial court accepted the psychologist's recommendation. It ordered that Charissa was designated the primary residential parent of Heather.[1] It then ordered Charissa to move back to the Snohomish/King County area until the child is eight years old.

A parenting plan was entered August 19, 1996, ordering Charissa and Heather to move to Washington by September 15, 1996.[2]

Charissa moved this court for a stay of that portion of

---

[1]Edmund argues on appeal that the trial court "never designated Charissa as the 'primary residential parent'." Brief of Resp't at 40. His assertion is contradicted by the record. "[T]his court finds that the mother should be the primary residential parent." Clerk's Papers at 25.

[2]Despite the fact that the parents did not then agree to a residential schedule which frequently alternated the child between households for substantially equal intervals of time, as required by RCW 26.09.187(3)(b)(ii)(A), the trial court entered a detailed residential schedule which almost evenly split the child's residential time between the parents each week. Then, despite the fact that no limitations, under RCW 26.09.191, were found to exist, it placed the following "restrictions" on the parents:

"a. Mother shall relocate to Washington by September 15, 1996 and remain there until the summer following Heather's 8th birthday.

"b. Until the summer following Heather's 8th birthday Mother shall live no more than one hour from Father's current residence. In the event Father moves before Heather reaches the age of eight, he shall move no more than one hour from Mother's residence.

"c. Heather shall be enrolled in a preschool in Washington within 3 weeks of Mother's relocation. The preschool shall be no more than 1 1/2 hours' drive from either household. Mother and Father shall share the responsibility for arranging transporting Heather to preschool, dependent upon the residential schedule.

"d. The parents shall mutually select a nanny from a reputable firm, who will be employed for at least two years from the date of entry of this parenting plan. The nanny shall travel and remain with Heather to each parent's household. Both parents shall cooperate with the nanny in arriving at decisions

the order requiring her to relocate to Washington and also petitioned for direct review of that order. Both the motion and the petition were granted.

## ISSUES

1. Does a trial court hearing a disputed parenting plan action have authority to require the parents to live within a certain geographic area in order to facilitate frequent contact between the child and both parents?

2. Are parenting plan provisions which are incorporated into a prenuptial agreement enforceable?

## DECISION

■ Generally, a trial court's rulings dealing with the provisions of a parenting plan are reviewed for abuse of discretion. *In re Marriage of Kovacs*, 121 Wn.2d 795, 801, 854 P.2d 629 (1993); *In re Marriage of Wicklund*, 84 Wn. App. 763, 770, 932 P.2d 652 (1996). A trial court abuses its discretion if its decision is manifestly unreasonable or

regarding Heather's well-being. Neither parent shall question the nanny regarding any issues beyond Heather's care and personal needs. Neither parent shall attempt to involve the nanny in matters not directly involving Heather's care. Any dispute re: nanny's duties or responsibilities shall be mediated.

"e. Both parents shall participate in therapy. Mother shall remain in her current therapy until such time as the therapist recommends termination. Father shall enroll in individual therapy with a doctoral-level, licensed psychologist or psychiatrist and shall advise Mother of the name of his therapist and date therapy started. Issues that should be addressed include, but are not limited to, anger management, interpersonal communications, and child development issues as they arise.

"f. Both parents shall participate in age-appropriate parenting classes for two years following the date of entry of this parenting plan. Each shall provide the other with information about the classes each has taken.

"g. Both parents shall participate in random drug and alcohol urinalysis for one year following the date of entry of this parenting plan. Any positive test results indicating use of alcohol or non-prescription drugs, or abuse of prescription drugs, shall result in an appropriate adjustment of the parenting plan. The agency shall be advised by letter that Counsel and the Court shall be furnished copies of any adverse urinalysis by the testing agency. . . .

"h. Father shall carefully examine the family farm and immediate surroundings to discern any potential safety dangers to Heather. Father shall build a child-safe outdoor play area for Heather and shall undertake appropriate actions to limit her access to the river. Father shall advise Mother of steps taken. . . ." Clerk's Papers at 51-53.

based on untenable grounds or untenable reasons. *Kovacs,* 121 Wn.2d at 801; *Wicklund,* 84 Wn. App. at 770 n.1.

■ A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard. *State v. Rundquist,* 79 Wn. App. 786, 793, 905 P.2d 922 (1995) (citing WASHINGTON STATE BAR ASS'N, WASHINGTON APPELLATE PRACTICE DESKBOOK § 18.5 (2d ed. 1993)), *review denied,* 129 Wn.2d 1003 (1996).

Geographic Restriction. We first address whether a trial court has authority, under the Parenting Act of 1987 (Parenting Act), to restrict the geographical area in which parents of a child may live following the dissolution of the parents' marriage.

Cases involving the geographic relocation of the primary residential or custodial parent following dissolution are intensely emotional. The issue has been highly litigated throughout the nation in the last decade, and the judicial results have been nearly as varied as the number of cases before the courts. *See generally* James Grayson, *International Relocation, the Right to Travel, and the Hague Convention: Additional Requirements for Custodial Parents,* 28 FAM. L.Q. 531 (Fall 1994); Judith S. Wallerstein & Tony J. Tanke, *To Move or Not to Move: Psychological and Legal Considerations in the Relocation of Children Following Divorce,* 30 FAM. L.Q. 305 (Summer 1996).

Until the last decade, however, relocation cases were relatively infrequent. The Tennessee Supreme Court in *Taylor v. Taylor,* 849 S.W.2d 319, 322 (Tenn. 1993), explained that early cases decided under the common law gave the father an absolute right to the custody of his children. *See also* 1987 Proposed Parenting Act Commentary and Text (available at Wash. State Archives) (herein-

after Commentary), at 7.[3] After the turn of the century, questions of child custody began to focus more on the welfare of the children, and the pendulum swung to the opposite extreme. For most of this century a mother was presumed by law to be the proper custodian of minor children. *See, e.g., Horen v. Horen*, 73 Wn.2d 455, 460, 438 P.2d 857 (1968); Commentary, at 7-8. Within the last decade or two, society has recognized the value of involving both parents in child rearing.

With that recognition has come the development of laws which attempt to protect the relationships between children and their noncustodial parents. In order to protect this relationship, many states have enacted statutes prohibiting a custodial parent from moving more than a specified number of miles from the other parent's residence without notice to the noncustodial parent and to the court. *See, e.g.*, ARIZ. REV. STAT. ANN. § 25-408(C) (West); IND. CODE ANN. § 31-1-11.5-21.1 (Michie); MO. REV. STAT. § 452.377; NEV. REV. STAT. § 125A.350; OR. REV. STAT. § 107.159; WIS. STAT. ANN. § 767.327(1) (West).

Other state legislatures have expressed that it is a matter of public policy that children have "frequent and continuing contact" with both parents. *See, e.g.*, ALA. CODE § 30-3-150; ARIZ. REV. STAT. ANN. § 25-408(A) (West); CAL. FAM. CODE § 4600(a) (West); COLO. REV. STAT. § 14-10-124(1); 13 DEL. CODE ANN. tit. 13, § 728(a); IOWA CODE ANN. § 598.41(1)(a) (West); MO. REV. STAT. § 452.375(4); MONT. CODE ANN. § 40-4-222; NEB. REV. STAT. § 43-2902; N.J. REV. STAT. § 9:2-4; N.M. STAT. ANN. § 40-4-9.1(A) (presumption in favor of joint custody); OR. REV. STAT. § 107.149; VA. CODE § 20-124.2(B) (Michie).

Our state Legislature has repeatedly refused to enact a "joint custody" law, see *Kovacs*, 121 Wn.2d at 804, and year after year has declined to determine that, as a matter of public policy, frequent and continuing contact with

---

[3]This Commentary was subsequently edited and replaced by the Parenting Act drafting committee. The amended version of the Commentary is not part of the legislative record. *See Kovacs*, 121 Wn.2d at 800 n.3.

both parents is in the best interests of the child.[4] Further, the Legislature has not placed a statutory restriction on the ability of either parent to move and has not even required notification before a change of residence.

Prior to the enactment of Washington's Parenting Act, this court recognized that a trial court, applying a "best interests of the child standard," had authority to prohibit a custodial parent from relocating without notice to the other parent, when such a restriction was in the best interests of the child, and when the restriction was subject to modification. *Kirby v. Kirby*, 126 Wash. 530, 219 P. 27 (1923); *Clarke v. Clarke*, 49 Wn.2d 509, 304 P.2d 673 (1956); *Nedrow v. Nedrow*, 48 Wn.2d 243, 292 P.2d 872 (1956).

This appeal addresses whether our current law authorizes a trial court to impose a geographic restriction in an initial parenting plan.[5] Although this court has not previously considered this issue, the Court of Appeals has twice affirmed geographic restrictions ordered in initial parenting plans. *In re Marriage of Sheley*, 78 Wn. App. 494, 895 P.2d 850 (1995), *review denied*, 128 Wn.2d 1009 (1996), and *In re Marriage of Schneider*, 82 Wn. App. 471, 918 P.2d 543, *review granted sub nom. In re Sheppard*, 130 Wn.2d 1001 (1996). Both Court of Appeals decisions are based on the conclusion that this state's Parenting Act authorizes a trial court to include a geographic restriction in a parenting plan when the trial court believes the restriction is in the best interests of the child. *Sheley*, 78 Wn. App. at 495;

---

[4]Bills which would require a preference for joint custody or joint parenting or which would establish that it was in a child's best interest to have frequent and continuing contact with both parents have been introduced in both the Senate and House every legislative session since 1982. None has ever passed.

[5]Other jurisdictions which have considered the issue of relocation have developed standards ranging from highly restrictive, requiring the moving parent to show exceptional circumstances in order to justify the relocation, *Weiss v. Weiss*, 52 N.Y.2d 170, 418 N.E.2d 377, 380, 436 N.Y.S.2d 862 (1981), to highly deferential, largely leaving the decision to relocate to the custodial parent. *Auge v. Auge*, 334 N.W.2d 393, 399 (Minn. 1983). *See generally* Grayson, *supra*, at 532. Because they are so diverse and because the statutory schemes are so varied from state to state, the decisions of other jurisdictions are not particularly helpful in analyzing Washington law.

*Schneider*, 82 Wn. App. at 477. We disagree with this underlying conclusion of these Court of Appeals decisions.

In determining whether such authority exists in a trial court, we turn to the legislative policies expressed in the Parenting Act and in the uniform marriage and divorce act, LAWS OF 1973, 1st Ex. Sess., ch. 157, both of which are contained in RCW 26.09. These policies are not always compatible.[6]

The uniform marriage and divorce act replaced the traditional grounds for divorce with a "no fault" standard. The statute reflects the public policy recognized in *De Burgh v. De Burgh*, 39 Cal. 2d 858, 250 P.2d 598, 601 (1952), that "when a marriage has failed and the family has ceased to be a unit, the purposes of family life are no longer served and divorce will be permitted." *See* UNIF. MARRIAGE AND DIVORCE ACT, 9A U.L.A. § 305 cmt. (1987). *See also In re Marriage of Little*, 96 Wn.2d 183, 188, 634 P.2d 498 (1981). The 1973 dissolution statute made sweeping changes in this state's divorce law, but it did not effectively address the issue of child custody. Commentary, at 1. The trial court was granted "broad discretion" in child custody matters to act in the "best interests" of the child, *see In re Marriage of Cabalquinto*, 100 Wn.2d 325, 327, 669 P.2d 886 (1983); *In re Marriage of Naval*, 43 Wn. App. 839, 845, 719 P.2d 1349 (1986), but was given little guidance in applying that discretion. *See* Commentary, at 8. This tended to result in inconsistent decisions and a perception of unfairness on the part of many of those involved in the judicial process. Commentary, at 1-3, 24.

During the late 1970s and early 1980s, a number of proposals for changes in the child custody provisions of the dissolution act were introduced in this state's Legisla-

---

[6]Wallerstein & Tanke write that "Court intervention designed to maintain the geographical proximity of divorced parents is fundamentally at odds with a divorce decision that necessarily determines that each parent will rebuild his or her life separate from the other. To require divorcing parents to spend their lives in the same geographical vicinity is unrealistic. . . . Forcing divorced parents to remain in the same place may undermine the divorce decision and threaten the child with continued instability throughout his or her childhood." Wallerstein & Tanke, *supra*, at 314.

ture. In an attempt to reconcile conflicts between competing factions, a multidisciplinary ad hoc committee was formed to draft a proposed law that would represent a variety of concerns and views relating to child custody. Commentary, at 9-10. The final result of their efforts was enacted by the Legislature as the Parenting Act of 1987.[7]

The Parenting Act represents a unique legislative attempt to reduce the conflict between parents who are in the midst of dissolving their marriage by focusing on continued "parenting" responsibilities, rather than on winning custody/visitation battles. In this state even the terms "custody" and "visitation" have been replaced with the concepts of "parenting plans" and "parental functions." *Kovacs*, 121 Wn.2d at 800-01.

The concept of a working "parenting plan" is the primary focus of the Parenting Act. 2 WASHINGTON STATE BAR ASS'N, FAMILY LAW DESKBOOK § 45.3(1), at Su-45-2 (1989 & Supp. 1996). The Act sets out a guide for parents to develop proposed and agreed plans for the continued parenting of their children. RCW 26.09.181, .184, .187. The key advantage of the parenting plan concept over the former law's custody concept is the parenting plan's ability to accommodate widely differing factual patterns and to allocate parental responsibility accordingly. Commentary, at 22.

The plan must contain provisions for (1) the resolution of future disputes between the parents, (2) allocation of decision-making authority, and (3) residential provisions for the child. RCW 26.09.184(2). It is only the residential provision which is at issue in this appeal.

The statute encourages the *parents* to work together to develop a plan for the postdecree parenting of the child. RCW 26.09.002, .015, .181. However, if the parents are unable to agree to a plan that is in the child's best interests, then the responsibility for developing the parenting plan falls upon the trial court. RCW 26.09.187. In developing

---

[7]Additional legislative history is set forth in *Kovacs*, 121 Wn.2d 795.

and ordering a permanent parenting plan, the court is given broad discretion. *Kovacs*, 121 Wn.2d at 801. That discretion must be exercised according to the guidelines set forth in RCW 26.09.187(3). This section, in turn, must be read in conjunction with RCW 26.09.184 (setting forth the objectives and required contents of the permanent parenting plan), RCW 26.09.002 (stating the policy of the Parenting Act), and RCW 26.09.191 (setting forth limiting factors which require or permit restrictions upon a parent's actions or involvement with the child).

■ The Parenting Act anticipates that the court will determine the child's residential schedule based on the best interests of the child, as they can be determined at the time of trial, after considering the factors set forth in RCW 26.09.187(3)(a). Those factors include the following:

(i) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;

(ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;

(iii) Each parent's past and potential for future performance of parenting functions;

(iv) The emotional needs and developmental level of the child;

(v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;

(vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and

(vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.

While continued parenting by *both* parents is the goal of the Parenting Act, RCW 26.09.002, the court's power to

create opportunities for "joint," as opposed to "shared," parenting is limited by the best interests of the child and by the limitations contained in the statute.

■ One of the limitations placed upon a trial court's authority is contained in RCW 26.09.187(3)(b). The Act permits a trial court to order a parenting plan that includes a residential schedule providing that the parents will have equal or substantially equal residential time with a child. However, the trial court may not order that a child *frequently alternate his or her residence between the households of the parents for brief and substantially equal intervals of time, unless*: (1) no limitations exist under RCW 26.09.191; (2) (a) the parents have agreed to the provisions and the agreement was knowingly and voluntarily entered into, or (b) the parents have a satisfactory history of cooperation and shared performance of parenting functions and the parties are available to each other, *especially in geographic proximity*, to the extent necessary to ensure their ability to share performance of the parenting functions; and (3) the provisions are in the best interests of the child. RCW 26.09.187(3)(b).

The Parenting Act drafting committee's comment on this provision is as follows:

> The committee was aware that agreements or orders which provide for alternating residence of the child for substantially equal intervals can result when the parties or the courts are searching for facile avoidance of child care disputes. Such temporizing arrangements may be harmful to the child. Therefore, [RCW 26.09.187(3)(b)] prohibits such alternation unless specific safeguards exist.

Commentary, at 27-28 (in part). *See also* Senate Journal, 50th Leg. (1987), at 1561 (Then Senator Talmadge, responding to a question whether the above section of the Parenting Act was intended to prevent parents from having equal time, stated, "No . . . . This section requires additional protection for children if the parents chose to achieve equal time by moving the children *frequently* back

and forth between the parents' households for *brief* periods of time. This type of pingpong provision, for a couple days with one parent and a couple of days with the other as a regular schedule can be harmful for children and should be done sparingly. That is the *purpose of this section*—not to limit the parents' time with the child." (Emphasis added)).

The safeguards required by the statute were not present in this case. The parties did not knowingly and voluntarily agree to the frequent, weekly changes of their daughter's residence, and the parties had no history of cooperation and shared performance of parenting functions. RCW 26.09.187(3)(b)(ii).

The trial court had no authority, under the facts of this case, to require the residential schedule it set forth in the parenting plan. This provision, requiring frequent, brief changes in residence, appears to be the basis for the trial court's geographic restriction on the residence of the mother.

Another section of the Parenting Act provides that restrictions may be included in any part of a parenting plan, if those restrictions are based on the trial court's finding that one or more of the factors listed in RCW 26.09.191 are present.

RCW 26.09.191(1) and (2) *require* the trial court to restrict a parent's conduct or involvement with the child if the trial court finds that a parent has engaged in willful abandonment or a substantial refusal to perform parenting functions; physical, sexual or a pattern of emotional abuse of a child; a history of acts of domestic violence or an assault or sexual assault which causes grievous bodily harm or the fear of such harm; or the parent has been convicted as an adult of one of the sex offenses listed in the statute.

RCW 26.09.191(3) *permits* a trial court to restrict a parent's actions under the parenting plan if the court finds that the parent's involvement or conduct may have an adverse effect on the child's best interests and if any of the following factors exist:

(a) A parent's neglect or substantial nonperformance of parenting functions;

(b) A long-term emotional or physical impairment which interferes with the parent's performance of parenting functions as defined in RCW 26.09.004;

(c) A long-term impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting functions;

(d) The absence or substantial impairment of emotional ties between the parent and the child;

(e) The abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development;

(f) A parent has withheld from the other parent access to the child for a protracted period without good cause; or

(g) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

██ Where justified by the facts, RCW 26.09.191(3)(f) or (g) permits a trial court to find that the primary residential parent's relocation would harm the child. We interpret RCW 26.09.191(3) to require more than the normal distress suffered by a child because of travel, infrequent contact of a parent, or other hardships which predictably result from a dissolution of marriage. *Cf. Wicklund*, 84 Wn. App. at 770-71 (restriction on homosexual behavior was not justified under the facts of the case).

Under the facts of *Sheley*, for example, the trial court could have concluded that the mother's proposed move from Seattle to Texas would have an adverse effect on the couple's children, who had recently had unusual difficulty adjusting to a move from Alaska to Washington. Special factors considered by the court included the fact that one of the children had special emotional needs and both were in counseling. The trial court found both parents equally suitable to act as the primary residential parent and further found, based on expert testimony, that the children

would suffer more from a move to Texas than from the loss of either parent. *Sheley,* 78 Wn. App. 497-98. Under the extraordinary facts of *Sheley,* the trial court was justified in determining a limiting factor existed, and then in conditioning the placement of the children on the mother's remaining in Washington. Unlike the ruling in the case before us, the trial court in *Sheley* did not impose a firm geographic restriction solely for the purpose of facilitating contact between the children and a father who was not as suitable a primary parent as the mother.

In any event, the trial court in this case determined that no basis for any limitation existed under RCW 26.09.191(1), (2) or (3). That finding is not challenged on appeal.

We appreciate the difficulty faced by trial courts in resolving disputed parenting plan issues and in attempting to fashion plans that are in the "best interests of the child." However, the structuring of the residential schedule contained in a parenting plan must be based on the statutory factors and the circumstances of the parties as they exist at the time of trial. There is nothing in this state's Parenting Act that gives a trial court the authority to alter the physical circumstances of the parties in order to create an environment that is, in the trial court's opinion, more desirable for the child than that which exists. Nor is there anything in the statute that gives the trial court the authority to restrict a parent from moving away from the child, or away from the other parent, unless a limiting factor exists, under RCW 26.09.191, which warrants the restriction.

A parenting plan's provisions are subject to modification as the circumstances of the parents and of the children change. RCW 26.09.260. In order to make sure that parents are able to take advantage of that opportunity, a trial court is encouraged to require, as part of the parenting plan, that either parent notify the other of significant changes, such as an anticipated change of residence, sufficiently in advance of the change to facilitate a modification in the residential schedule of the child.

The Parenting Act attempts to afford parents the opportunity to continue parenting their children after dissolution of the marriage. However, the practical result of a marriage dissolution is that parenting and family life will not be the same after dissolution. This is so even though a trial court may believe it is in the "best interests of the child" to continue to live in the same family unit. A child cannot escape the reality that his or her family is no longer the same. The trial court does not have the responsibility or the authority or the ability to create ideal circumstances for the family. Instead, it must make parenting plan decisions which are based on the actual circumstances of the parents and of the children as they exist at the time of trial. To the extent they are inconsistent with this decision, *Sheley* and *Schneider* are overruled.

Prenuptial Agreement. Edmund Littlefield argues that Charissa waived any right to object to the geographic restriction contained in the parenting plan when she signed the parties' prenuptial agreement and again, after separation, when she moved into a house in Seattle.

Two provisions of the prenuptial agreement are involved. One, paragraph 19, requires Edmund Littlefield to provide a suitable house for Charissa and any children of the marriage. The other, paragraph 18, requires that any children of the parties are to spend equal residential time with both parents.

Paragraph 19, which is quoted in part above, is clear on its face. It provides for the support of any children. Contrary to Edmund's argument, paragraph 19 does not require Charissa to live in Seattle. The only reference to Seattle is in terms of using the fair market value of homes in north Seattle in determining a fair value for the house which Edmund agreed to provide for Charissa and any children as part of his child support and spousal mainte-

nance responsibilities.[8] By participating in the purchase of the house in Seattle, Charissa did not waive her right to move from Seattle.

Paragraph 18, however, provides that any child of the marriage will spend equal residential time with both parents. The trial court ruled that it would consider this parenting plan provision of the prenuptial agreement but that the provision was not binding on the court. We agree.

■ The Parenting Act requires a trial court fashioning a residential schedule for a child to consider the agreements of the parents, provided the agreements were entered into knowingly and voluntarily.[9] RCW 26.09.187(3)(a)(ii). The statute also attempts to encourage amicable settlements of disputes connected with separation and marriage dissolution. RCW 26.09.070. However, a trial court is not required to follow the terms of a separation agreement which relate to the parenting of children. RCW 26.09.070(3); *In re Marriage of Thier*, 67 Wn. App. 940, 944, 841 P.2d 794 (1992) (the terms of an agreement pertaining to child custody are not binding on the trial court).

The agreement may be considered by the court, in light of the circumstances and knowledge of the parties when the agreement was made, but it is not enforceable.

Attorney fees. The mother requests her attorney fees on appeal, pursuant to RCW 26.09.140. Any such award is based on a consideration of the financial resources of the parties. Considering the relative resources of Edmund and Charissa Littlefield, we award the mother her attorney fees on appeal.

---

[8]In addition to making a provision for a house, paragraph 19 provides for child support payments, payment of child care, school, extracurricular activities, medical and dental costs, and college expenses and spousal maintenance.

[9]The agreement in this case did not contemplate the needs of any particular child, was entered into at a time when the father's contact with his only living child was restricted to supervised visits of a maximum of four hours every other week, and was made without the knowledge of how either party would act toward a child. Based on this record, we find it unlikely that these parties could have *knowingly* provided for the parenting of a child at the time the agreement was signed.

We affirm the designation of the mother as primary residential parent. We reverse the geographic restriction and remand for entry of a residential schedule that is based on the circumstances of the parties, including the geographic distance between households, that exists at the time the parenting plan is entered.

DURHAM, C.J., and DOLLIVER, SMITH, JOHNSON, MADSEN, ALEXANDER, and TALMADGE, JJ., concur.

SANDERS, J. (concurring) — I agree the trial court erred when it ordered Charissa Littlefield, Edmund Littlefield's former wife, to move back to Washington. She had already established her California residence prior to trial and had violated no temporary order when she did so. At that point the trial court "must make parenting plan decisions which are based on the actual circumstances of the parents and of the children as they exist at the time of trial." Majority at 57. I write separately to stress the narrow basis for today's holding and to reject portions of the majority opinion which are both obiter dicta and legally erroneous.

The majority rightly holds the trial court was without authority under RCW 26.09.187(3)(b)(ii)(B) to order frequent but brief alternations in the place of residence of Edmund and Charissa's daughter, Heather Littlefield, because the parties were not in geographic proximity. *See* Majority at 54 ("The safeguards required by the statute were not present in this case. . . . The trial court had no authority, under the facts of this case, to require the residential schedule it set forth in the parenting plan. This provision, requiring frequent, brief changes in residence, appears to be the basis for the trial court's geographic restriction on the residence of the mother."). The record shows the parties simply did not meet the statutory prerequisite for frequent, brief changes for lack of geographic proximity. Consequently, the trial court's order that Charissa move to Washington to fulfill that portion of the parenting plan was error because this portion of the plan was itself invalid. This decides the case. All else is dicta.

However the majority does not stop but renders an advisory opinion on other issues. The majority unnecessarily notes the trial court found no basis for any limitation or restrictions in the parenting plan. And it legally errs when it states the trial court has almost no ability to enter an order restricting a custodial parent's ability to move. This conclusion is not only unnecessary but also error as it plainly contradicts the language and purpose of the Parenting Act which allows the trial court to impose such a restriction when it serves the best interest of the child.

The majority's opinion is based upon the false assumption that nothing in the Parenting Act grants the trial court the power to issue geographical restrictions in the parenting plan. To the contrary the Parenting Act retains the trial court's "broad discretion" in matters concerning the welfare of children. *In re Marriage of Cabalquinto*, 100 Wn.2d 325, 327, 669 P.2d 886 (1983). The correct question is not whether the Act grants such power, but whether the Act takes it away. Nothing in the Act precludes the trial court from entering such a restriction *if the court finds such a restriction is in the best interest of the child.*

The majority pays scant regard to the directives of the Legislature. The legislative statement of policy raises one consideration above all others:

> In any proceeding between parents under this chapter, *the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities. . . .* The best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care. *Further, the best interest of the child is ordinarily served when the existing pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm.*

RCW 26.09.002 (emphasis added). Long before the Legislature passed the Parenting Act this court recognized the

vital importance that court decisions play on placing the best interest of the child above all other interests. *See Kirby v. Kirby*, 126 Wash. 530, 532, 219 P. 27 (1923) ("In cases of this kind, the matter of first importance is the welfare of the child."); *Nedrow v. Nedrow*, 48 Wn.2d 243, 250, 292 P.2d 872 (1956) (quoting *Kirby*). The New York Court of Appeals recently explained why the best-interest-of-the-child standard is paramount in custody and residency disputes:

> While the respective rights of the custodial and noncustodial parents are unquestionably significant factors that must be considered . . . *it is the rights and needs of the children that must be accorded the greatest weight, since they are innocent victims of their parents' decision to divorce and are the least equipped to handle the stresses of the changing family situation.*

*Tropea v. Tropea*, 87 N.Y.2d 727, 665 N.E.2d 145, 150, 642 N.Y.S.2d 575, 580 (1996) (emphasis added).

The majority correctly notes:

> Prior to the enactment of Washington's Parenting Act, this court recognized that a trial court, applying a "best interests of the child standard," had authority to prohibit a custodial parent from relocating without notice to the other parent, when such a restriction was in the best interests of the child, and when the restriction was subject to modification.

Majority at 49 (citing *Kirby* and *Nedrow*). The Parenting Act, however, contains no language which impairs the trial court's authority to impose geographic restrictions. "[S]tatutes must be construed with reference to the common law, for it must not be presumed that the legislature intended to make any innovation on the common law without clearly manifesting such intent." *Green Mt. School Dist. No. 103 v. Durkee*, 56 Wn.2d 154, 161, 351 P.2d 525 (1960). If anything, the Legislature's Parenting Act reinforced the emphasis on the best interest of the child already present in this State's common law.

The Legislature specifically stressed its paramount concern for the best interest of the child in exactly those sections of the Parenting Act at issue here. RCW 26.09.187(3)(a) directs the trial court to make residential provisions for each child which encourage each parent "to maintain a loving, stable, and nurturing relationship with the child . . . ." Most importantly, RCW 26.09.191(3)(g), relied upon by the majority to limit the trial court's authority to enter geographical restrictions, expressly provides that the trial court may preclude or limit any provision of the parenting plan if it finds "factors or conduct . . . adverse to the best interests of the child."

This section does not limit the trial court's broad discretion to protect the best interest of the child. The statute is clear: A trial court may preclude or limit any provision of the parenting plan if the court finds the provision is adverse to the best interests of the child. Yet the majority holds this section "require[s] more than the normal distress suffered by the child because of travel, infrequent contact of a parent, or other hardships which predictably result from a dissolution of marriage." Majority at 55. Why? Upon what portion of the statute is this conclusion based? There is no hint of this in the cited section. Nor is there hint in this section that a geographical restriction need be justified by any more than the trial court's determination that a move away from the noncustodial parent is not in the best interests of the child. By implication the majority's dicta seem to say the best interest of the child is secondary to the interest of one of the parents.

How would the majority deal with the custodial parent who moves from the jurisdiction in violation of a court order to spite the other spouse at the expense of the child's interest to maintain a loving and nurturing relationship with the absent parent? I think the majority underestimates the depravity, wickedness, and meanspiritedness of some (not Charissa) who would injure their own child to deprive the other parent of his or her natural and fundamental right to maintain a relationship with their

own child. The statute says the court must act to protect the child—and grants it ample legal authority to do just that.

The majority's ipse dixit decision restricting the scope of the trial court's broad discretion to protect the child finds no basis in the language or policy of the Parenting Act. The majority states, "[t]here is nothing in this state's Parenting Act that gives a trial court the authority to alter the physical circumstances of the parties in order to create an environment that is, in the trial court's opinion, more desirable for the child than that which exists." Majority at 56. Poppycock. The trial court has the explicit authority to alter the physical circumstances of the parties to create any environment which is in the best interests of the child. RCW 26.09.191(3)(g). To the extent *In re Marriage of Schneider*, 82 Wn. App. 471, 478, 918 P.2d 543 (1996), and *In re Marriage of Sheley*, 78 Wn. App. 494, 502, 895 P.2d 850 (1995) recognize the trial court has the statutory authority to restrict a residential parent from *relocating* the child outside a certain determined area they both remain an accurate statement of the law. But ordering a parent to move from a lawfully established residence is a different matter.

For these reasons, I concur in result.