

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | |
| | ) | No. 35836-4-III |
| WESLEY S. PRUITT, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| and | ) | UNPUBLISHED OPINION |
| | ) | |
| JENNIFER L. PRUITT, | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — Wesley Pruitt appeals final orders in the dissolution of his marriage to Jennifer Pruitt. He contends the trial court imposed untailored restrictions in a final parenting plan that are not supported by the record and are not in his young children's best interests. He also contends the trial court ignored the value of separately owned stocks that he brought into the marriage.

We affirm the financial provisions of the decree but reverse the final parenting plan and remand for the entry of findings of the harm justifying the visitation restrictions that were imposed under RCW 26.09.191.

No. 35836-4-III
*In re Marriage of Pruitt*

FACTS AND PROCEDURAL BACKGROUND

Wesley and Jennifer Pruitt were married on August 8, 2008. They have two children: a son who was six years old at the time of the divorce trial, and a daughter who was then three years old.

Jennifer[1] characterizes Wesley as abusive and controlling during their marriage. She reports that he repeatedly physically abused her by forcing her to the ground and lying on her with his full body weight until she stopped resisting. She claims he also verbally abused her, criticizing her appearance and telling her how embarrassed and ashamed he was of her. Jennifer explains that she did not report Wesley's abuse because she was scared and embarrassed.

She contends that Wesley also directed abuse toward their two children. On Memorial Day weekend 2016, she used her phone to take four videos to document the abuse; according to Jennifer, she took the videos because she did not think anyone would believe her otherwise. Three videos were of Wesley lying on top of his struggling son, and the last was of Jennifer asking questions of her son about this lying-on-top-of-others "game" that the boy says his father calls "tackle." Clerk's Papers (CP) at 106. A few days later, on June 14, 2016, Jennifer applied for and obtained a temporary order of protection against Wesley and changed the locks on the doors of their home.

_____

[1] Given the common last name of the parties, we refer to them by their first names for ease of reading. We intend no disrespect.

2

Wesley was at work that day and found it strange that he had not heard from Jennifer because they normally spoke during the day and she usually brought him lunch. He went home at lunchtime and discovered he was locked out. He called the police, who clarified what was happening by serving him with the temporary protection order.

On June 10, Wesley petitioned for divorce. On the return date for the protection order Jennifer had obtained on a temporary basis, Wesley opposed it, but it was granted. His request to revise the protection order was denied.

On June 14, Jennifer contacted the Spokane Police Department and reported Wesley's alleged abuse of the couple's children. She provided police with copies of her four videos. On July 8, Wesley was arrested and was charged with assault in the second degree by suffocation. All contact between Wesley and his children was suspended until further order of the court.

The criminal charges against Wesley were dismissed without prejudice on September 9, 2016. The order dismissing the charges also rescinded an order that Wesley surrender weapons and quashed a bench warrant.

Child Protective Services had received a police referral in June, when Jennifer contacted the police department, and it had initiated its own investigations into Wesley's alleged abuse of the children. It originally arrived at "founded" findings of abuse of both children, but it later reversed its finding with respect to the daughter, closing the

allegations about her as unfounded. At the time of the divorce trial, Wesley's challenge to the founded finding of abuse of his son was on appeal.

On September 12, 2016, having learned that the State had dismissed the criminal charges against Wesley, Jennifer moved the trial court to limit his residential time with the children to therapeutic counseling. Wesley opposed the request, but a court commissioner granted it on September 22. Shortly thereafter, on September 29, Mary Ronnestad was appointed guardian ad litem for all issues related to making a parenting plan for the children, allegations of domestic violence and child abuse perpetrated by Mr. Pruitt, and "[a]llegations of Ms. Pruitt regarding the children in ongoing litigation." Report of Proceedings (RP) at 29.

In December 2016, Jason Raugust was approved by the court to handle therapeutic visitation between Wesley and his children, and the visitation began. Although not court-ordered to do so, Wesley undertook several actions in hopes of alleviating the trial court's concern about him resuming a full parental relationship with his children. Wesley enrolled in an eight week parenting program that he completed in March 2017. He completed a domestic violence (DV) assessment by a Washington State certified and licensed domestic violence program. The assessment concluded that Wesley had behaved in ways that could have been considered abusive but that there was not a pattern of power and control and he did not require further treatment.

4

In the summer of 2017, Jennifer moved to renew the protection order. A court commissioner denied her request in early July. Jennifer moved for revision, which was denied. Later in July, Wesley's residential time was expanded to add three Saturday visits to the ongoing therapeutic visits with Mr. Raugust. The Saturday visits were required to be monitored by at least one of Wesley's parents.

The dissolution trial took place over several days in October 2017. There was diametrically different testimony about whether there was domestic violence in the marriage. Jennifer insisted that Wesley abused her and the children. Wesley admitted being critical and judgmental of Jennifer and testified that he regretted it; he also testified that he and his wife argued during the marriage and that both raised their voices. But he denied any physical violence. His claims that there was no physical violence were supported by his parents and his sister.

Ms. Ronnestad testified at trial that there had been no new reports of alleged abuse by Wesley following Jennifer's report on June 14, 2016. She testified that she spoke with Mr. Raugust the Friday before her own testimony and, while he had told her he would not be testifying,

> He just wanted to make sure that I was aware that Mr. Pruitt has been very consistent, and that everything has been very positive with him; that the children enjoy their time with him; that he sees a strong connection; that the kids really seem to be working on forming a bond with their dad and have a bond with their dad; that he does not see a fear on the kids' part; that he sees a lot of progress from day one.

That the kids are engaging with their father; that they are speaking out—for hugs or kisses. They are disappointed when they have to leave. And that the kids are sharing things with dad that they have done, and they're doing and things like that.

RP at 62-63.

Ms. Ronnestad had reviewed the three video clips of Wesley "tackling" his son and described them as follows:

Q. How long was the video?
A. Very short. There were, if I remember correctly, actually several—I think three—short, few second-long snippets. More than a second. Off the top of my head, ten seconds—
I mean, they were very short.
Q. Okay. And who—Is there a certain child in the video?
A. [The son.]
. . . .
Q. Okay. Tell me what you see in the first snippet?
A. They were all three similar, which would be Mr. Pruitt kind of laying on [his son], on a floor. And the person videoing was off to the side kind of facing them.
. . . .
Q. Okay. In your professional opinion, when you viewed these videos do you believe Mr. Pruitt was acting in an abusive manner?
A. I can't state looking at the videos, yes, they were absolutely abusive. I can state that they caused some questions and some concerns from looking at them.
Q. Okay. Did you ask Mrs. Pruitt what she did to stop Mr. Pruitt from doing those things?
A. I don't know that I asked her specifically to stop. It was more of a conversation about what was happening in a larger picture, I guess.
Q. So she talked to you about the context of those videos?
A. Yes.
Q. And what did she tell you the context of the videos were?
A. She had stated that this was something that Mr. Pruitt did both to her and [her son], was to lay on them with his body weight. And if she would scream, he would sometimes put his hand over her mouth. And that

6

it wasn't even necessarily a disciplinary thing, but that it was abusive. And it could be because he was angry, and sometimes it wasn't. And that he had begun doing this with [their son]. And that [her son] would cry and want to get up.

And that she didn't believe anyone would believe her when she would tell this story, so that is why she took the videos.

Q. Okay. You mentioned that he did that sometimes when he was angry.

She give you any other motivations as to why Mr. Pruitt would do this?

A. She had said sometimes he would just do this. This was the behavior. Because I specifically asked, is this something that he used necessarily always for discipline. And she said, no; sometimes it was, sometime[s] it wasn't.

Q. Did she give you any other references of people that also observed this behavior from Mr. Pruitt?

A. No.

Q. And the three snippets, three segments of video, Ms. Ronnestad, does [the son] cry in the video?

A. Yes.

Q. Does he cry in all three?

A. No.

Q. Does he just cry in one of them?

A. I know for certain of one of them. I don't believe in the other two.

. . . .

Q. Did you ever observe Mr. Pruitt in these video[s] putting his hand over [his son's] mouth (indicating)?

A. No. I don't recall that.

. . . .

Q. Certainly one perspective is this was someone abusing their child; correct?

A. Yes.

Q. And the professionals have said it is abuse.

A. Yes.

Q. Could another possibility be that Mr. Pruitt was playing with [his son]?

A. Yes.

Q. In your interviews with collaterals, Ms. Pruitt, her collaterals, Mr. Pruitt, his collaterals, how do the people that know [the son], how do they describe [him]? What is he like?

A. He's very boisterous. He is busy. And he is a happy, really nice kid.

Q. Okay. Has Mr. Raugust in his observation of Mr. Pruitt in therapeutic visits, has Mr. Raugust described how [the son] plays with his dad?

A. Yes.

Q. How does [the son] play with his dad?

A. Very well.

Q. Is he physical with his dad; does he climb on his dad?

A. Absolutely. He hugs him. He kisses him. All those things.

Q. Did you observe any other videos that depicted alleged abuse in this case?

A. No.

RP at 35-40.

Ms. Ronnestad's parenting recommendation was that Jennifer be the primary caregiver for the children and that Wesley continue to have supervised contact with the children that "might include two day visits three weekends per month plus therapeutic visits." Sealed Clerk's Papers (SCP) at 317. She recommended that Wesley obtain "some kind of appropriate therapy" to address his behavior and "[i]f this happens . . . this matter be reviewed to provide for additional time." SCP at 318.

The only financial issue raised on appeal is whether the trial court failed to consider the appreciation in Wesley's separate property contributions to a 401(k) account when it allocated that asset to the parties. Among Wesley's evidence were account statements showing that his 401(k) had a value of $78,000.00 at the beginning of 2008

(prior to the parties' marriage) but had declined in value to $15,391.85, as of August 2008, when he and Jennifer wed. Wesley testified that the decline was the result of the stock market crash, and he asked the trial court to treat $78,000.00 as separate property, in light of the fact that the market recovered following the marriage.

The trial court issued a letter decision following trial. Addressing the parenting plan, the court largely adopted Ms. Ronnestad's recommendations, placing the children primarily with Jennifer and ordering Wesley to engage in and complete a DV treatment program. Its decision provided that "[a]fter Mr. Pruitt has commenced and completed three months of DV treatment he can motion the court for a review of the monitored visitation and the need to continue the therapeutic visits. If treatment is progressing and if there are not other significant issues, the Court would believe it would be appropriate to move forward with unmonitored daytime contact for Mr. Pruitt." CP at 343-44. The court did not impose any other treatment conditions for Wesley and denied Jennifer's request for a new protection order.

The decision stated that the court "will find that domestic violence has occurred in the past by Mr. Pruitt against Ms. Pruitt and the children. Accordingly, [an RCW 26.09.191] restriction is ordered." CP at 343. It disclosed that it was "reluctant to enter a plan that does not have finality to it. However, the Court is not ready to step to a 'traditional' plan at this time." *Id.* It ordered the visitation schedule established in late July 2017, to continue until further order.

Addressing the single financial issue raised on appeal, the court treated the

$15,391.85 value of Wesley's 401(k) plan as of August 2008, as the separate property

component of that asset, explaining:

> There was no evidence upon which the Court can segregate out earnings on
> the original balance.  Additionally, there is no evidence upon which the
> Court can segregate out the earnings on post-separation contributions, so
> the increase in the account will be considered community, except for the
> contributions Mr. Pruitt and his employer have made into the account over
> the last seventeen months.

CP at 340.

In December 2017, the trial court entered a final parenting plan.  It included a

finding that Wesley had a history of domestic violence with Jennifer and the children that

supported placing limitations on him under RCW 26.09.191.  Although characterized as a

final order, the parenting time schedule provision was interim in nature, consistent with

the court's earlier written decision.  Wesley appealed, challenging only the parenting plan

restrictions and the characterization of only $15,391.85 of his 401(k) as separate

property.

The appeal was scheduled for decision without oral argument on June 13, 2019.

In conferencing on the appeal, the panel questioned whether the challenge to the

parenting plan restrictions had become moot, given the passage of time and Wesley's

right to return to court for review of the restrictions.  The parties were asked to inform the

court of their position on mootness and were given leave to submit evidence and

10

argument supporting their position on the issue.  Wesley alone filed a submission and contends the issue is not moot.

## ANALYSIS

I.    PARENTING PLAN

RCW 26.09.187(3)(a) provides generally that in arriving at the residential provisions of a final parenting plan:

> The court shall make residential provisions for each child which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances.

RCW 26.09.191(2)(a)(iii) provides that a parent's residential time with a child shall be limited if it is found that the parent has engaged in certain types of serious dereliction of parental duties, abuse, violence, or criminal conduct.  One basis for limitation is where "the parent has engaged in . . . a history of acts of domestic violence as defined in RCW 26.50.010(3)."  "Domestic violence" is defined to include "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, between family or household members."  RCW 26.50.010(3)(a).

Restrictions imposed under RCW 26.09.191(2)(a) "shall be reasonably calculated to protect the child from physical, sexual, or emotional abuse or harm that could result if the child has contact with the parent requesting residential time."

RCW 26.09.191(2)(m)(i). Restrictions under RCW 26.09.191 "cannot be imposed for unfounded reasons." *In re Marriage of Katare*, 175 Wn.2d 23, 37, 283 P.3d 546 (2012).

At trial, Wesley's lawyer characterized the parenting issues as "most important" and asked the trial court to impose a tiered parenting plan, guided by input from Mr. Raugust, under which "visitation is slowly built up over time until Mr. Pruitt . . . gets a normal parenting plan." RP at 18. Wesley argues that his own proposal would have met the statutory requirement for a reasonable relationship between restrictions and the risk of emotional abuse or harm. He argues that the more onerous restrictions imposed by the trial court are not reasonably related to any articulated risk of emotional abuse or harm.

Wesley satisfies us that the issue is not moot. The supplemental materials he has submitted demonstrate that in early January 2018, Jennifer moved to disqualify Mr. Raugust as the provider of therapeutic visitation because Wesley was receiving individual counseling from someone who works from the same office suite as Mr. Raugust. A court commissioner granted the motion in February 2018. It took until the end of April 2018, for the parties and the court to arrive at court approval of a new therapeutic counselor. The court-approved counselor turned out not to be accepting new patients.[2]

---

[2] One year earlier, Wesley had filed a declaration outlining the difficulties in identifying Mr. Raugust, stating it had been "very difficult to find a counselor who has the availability to accept new clients, and who is willing to accept our case and provide therapeutic visitation." CP at 217.

In June 2018, Wesley moved to expand his residential time with his children, supported by documentation that he had completed four months of domestic violence treatment. Jennifer opposed expanded visitation. The most recent order, entered by a court commissioner in August 2018, keeps the limitations in place and provides that Wesley can move to expand his visitation time 30 days after therapeutic visitation resumes. Wesley apparently remains subject to the challenged restrictions.

A trial court's parenting plan is reviewed for an abuse of discretion, which "occurs when a decision is manifestly unreasonable or based on untenable grounds or untenable reasons." *Katare*, 175 Wn.2d at 35 (citing *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997)). The trial court's findings of fact are treated as verities on appeal, so long as they are supported by substantial evidence. *Id.* (citing *Ferree v. Doric Co.*, 62 Wn.2d 561, 568, 383 P.2d 900 (1963)). "Substantial evidence" is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted. *Id.*

We find no abuse of discretion by the trial court in finding a history of domestic violence in order to exercise authority to impose tailored restrictions under RCW 26.09.191(2)(a). At issue is whether the restrictions *are* tailored; that is, whether they are reasonably calculated to protect the children from abuse or harm that could result if Wesley is given additional, less restrictive, visitation.

In *In re Marriage of Chandola*, 180 Wn.2d 632, 327 P.3d 644 (2014), our Supreme Court reviewed a parenting plan restriction under a different subsection of

RCW 26.09.191—subsection (3)(g), which authorizes a court to impose restrictions if necessary to protect against "adverse [effect] to the child's best interests." Part of the court's analysis in *Chandola* is applicable to all parenting plan restrictions imposed under RCW 26.09.191(3), however. Reading the statute in light of chapter 26.09 RCW's statement of policy, the court concluded that "the legislature intended RCW 26.09.191(3) restrictions to apply only where necessary to 'protect the child from physical, mental, or emotional harm,' . . . similar in severity to the harms posed by the [factors] specifically listed in RCW 26.09.191(3)(a)-(f)." *Chandola*, 180 Wn.2d at 648 (quoting RCW 26.09.002). It also held that a trial court abuses its discretion if it imposes a restriction that is not reasonably calculated to prevent such a harm. *Id.* Most importantly for this appeal, it held that a trial court must identify the harm that children will suffer if the restrictions are not imposed. *Id.* at 654.

In *Chandola*, the Supreme Court affirmed one limitation on the father's visitation: staged increases in the amount of visitation that would take place upon demonstrated improvement in his parenting skills. *Id.* at 640, 651. The harm that the court agreed justified the limitation was that the father had demonstrated an inability to provide his young daughter with a proper diet, sleep schedule, or socialization. *Id.* at 649. A different visitation limitation was reversed, however, because the court concluded it was based only on the trial court's opinion about proper child rearing. The court held that "[b]y requiring trial courts to identify specific harms to the *child* before ordering

14

parenting plan restrictions, RCW 26.09.191(3) prevents arbitrary imposition of the court's preferences." *Id.* at 655.

The Supreme Court's decision in *Chandola* was not brought to the attention of the trial court below when it entered the final parenting plan. The trial court did not identify any harm that Wesley and Jennifer's children would suffer without the significant limitations that the final parenting plan imposed on visitation with Wesley. *Chandola* is controlling authority that such findings are required. We reverse the final parenting plan and remand for entry of a new plan that complies with *Chandola*'s requirements.

II.    SEPARATE PROPERTY VALUATION

Wesley's contention that the trial court failed to consider or value the growth on his premarital 401(k) assets is easily rejected. He did not provide sufficient evidence that traceable assets had appreciated in value.

An asset is separate property if acquired before marriage, acquired during marriage by gift or inheritance, acquired during marriage with the traceable proceeds of separate property, or, in the case of earnings or accumulations, acquired during permanent separation. *In re Marriage of White*, 105 Wn. App. 545, 550, 20 P.3d 481 (2001). Separate property brought into the marriage will retain its separate character as long as it can be traced or identified. *In re Marriage of Schwarz*, 192 Wn. App. 180, 190, 368 P.3d 173 (2016). If community and separate funds are so commingled that they cannot be distinguished or apportioned, the entire amount is rendered community

15

property. *In re Marriage of Pearson-Maines*, 70 Wn. App. 860, 866, 855 P.2d 1210 (1993).

A trial court has considerable discretion in making a property division, and "will be reversed on appeal only if there is a manifest abuse of discretion." *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). "'A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.'" *Id.* (quoting *Littlefield*, 133 Wn.2d at 46-47).

Wesley's evidence in support of his request to be credited with $78,000.00 for pre-marital 401(k) assets was limited to his own testimony. He demonstrated that his 401(k) assets were worth $78,000.00 at the beginning of 2008, and that the fall in value to $15,391.85 in the month he and Jennifer wed was the result of a sharp market decline during the Great Recession. His justification for the $78,000.00 separate property valuation consisted of the following:

> Q. Do you have a value, sir, that you would like to give it?
> A. As it appears on here, 78,000.
> Q. Did the market recover, sir?
> A. Yes.

RP at 191-92.

We can take judicial notice that the stock market did recover, and even that the

16

price of some stocks recovered from 2008 lows within a matter of a few years.[3] But Wesley presented no evidence that the stocks held in his 401(k) account at the time of his marriage remained unsold in the account and regained their earlier value. On appeal, he suggests that by looking at the exhibits submitted, the trial court could have figured that out for itself. We are not persuaded that it could; more importantly, it was Wesley's burden to demonstrate appreciation in traceable premarital holdings. It was not the trial court's job to figure it out.

We affirm the financial provisions of the decree, reverse the final parenting plan, and remand for further proceedings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____      _____
Korsmo, J.                                      Fearing, J.

---

[3] *E.g., In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 799 (9th Cir. 2017) ("historical stock prices are 'not subject to reasonable dispute' and 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned'" (quoting FED. R. EVID. 201(b))).