# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Marriage of: | No.  59637-7-II |
| MOHAMMAD MAHMUD, | |
| Respondent, | |
| and | |
| NATALIYA MAKARENKO, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Following a seven-day dissolution trial held over two years, Nataliya Makarenko appeals the trial court's final divorce order, final parenting plan, and final child support order. Specifically, Makarenko asserts the trial court abused its discretion when the court (1) determined her former spouse, Mohammad Mahmud, was entitled to reimbursement for various assets; (2) calculated the valuation of those assets and the equalization payments to Makarenko; (3) designated Mahmud as sole decision-maker for their daughter's healthcare and education decisions; (4) restricted Makarenko's ability to travel with their daughter; and (5) calculated Mahmud's income for the purposes of child support payments. Makarenko also contends that the trial court judge was biased in favor of Mahmud and requests a new judge be assigned on remand.

We affirm in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion. Because Makarenko offers no evidence of judicial bias, we decline to assign a new judge on remand.

FACTS

Mahmud and Makarenko married in late March 2008. Mahmud and Makarenko have one daughter, S.M., born in 2010.

A.    BUSINESS INTERESTS

Mahmud and his father, Colonel Mahmud ul Hasan (Hasan), were involved in several business interests together. In 2003, Mahmud served as a manager of MKT Investments, LLC (MKT), of which Hasan was a member. In 2005, Mahmud became a member of MKT. Mahmud's contribution to and interest in MKT derived from the sale of family properties in Pakistan. MKT owned various properties, including a gas station and convenience store in Mulino, Oregon (Mulino) and a motel in Tillamook, Oregon called the Western Royal Inn (Western Royal). From 2003 onward, Mahmud managed all of MKT's U.S. properties, including Mulino and Western Royal.

B.    RIDGEFIELD HOUSE

In 2006, Mahmud formed West Coast Ridgefield Properties, LLC. Mahmud was the sole member of West Coast Ridgefield Properties and Hasan appeared to have been a manager. Mahmud, as sole member of West Coast Ridgefield Properties, purchased a house in Ridgefield (Ridgefield house) for $1,700,000. Mahmud paid a $50,000 down payment for the Ridgefield house. The remaining $1,650,000 payment for the Ridgefield house came from an inheritance— the proceeds of the sale of Mahmud's maternal grandfather's home in Pakistan. Hasan facilitated the transfer of funds from Pakistan to the U.S. for Mahmud to make the payment for the Ridgefield house. Hasan was never a member of West Coast Ridgefield Properties nor was he ever an owner of the Ridgefield house.

Then, on March 10, 2008, a few weeks before Mahmud and Makarenko married, Mahmud quitclaimed the Ridgefield house from West Coast Ridgefield Properties to his name individually. On March 11, Mahmud took out a mortgage of $417,000 on the Ridgefield house.

Following their marriage, Mahmud and Makarenko occupied the Ridgefield house as their primary residence. As of February 2023, the remaining mortgage was approximately $380,000.

C.      2008 LAWSUIT AND SETTLEMENT AGREEMENT

In April 2008, Mahmud and Hasan had a dispute over business interests. The dispute led to several lawsuits between Mahmud and Hasan.[1] In one of those lawsuits, Hasan, apparently in his capacity as manager of West Coast Ridgefield Properties, sued Mahmud for allegedly fraudulently transferring ownership of the Ridgefield house to Mahmud individually from West Coast Ridgefield Properties with the 2008 quitclaim deed. However, in December 2008, Mahmud and Hasan reached a global settlement agreement (2008 Settlement) in which there was a mutual release of all claims between the two.

Section 1.1 of the 2008 Settlement stated:

Hasan shall pay Mahmud[2] the sum of One Million Seven Hundred Seven Thousand Nine Hundred Fifty-Nine Dollars and Thirty Cents ($1,707,959.30) by deposit into a . . . client trust account for the benefit of Mahmud (subject to a $350,000 holdback for certain potential deductions) immediately upon execution of this Agreement. . . . Upon Mahmud's performance of the obligations in paragraphs 1.2, 1.3, 1.6, and 1.11, and the execution of motions to dismiss all of the above-referenced lawsuits, the sum of $1,357,959.30 shall be released . . . . The holdback sum of $350,000 . . . shall be released to Mahmud after Mahmud's performance of the obligations in paragraph 1.9 (and after Hasan or his agents have

---

[1] Mahmud's sister, Mariam Mahmud, was also a party to some of the lawsuits.

[2] In the 2008 Settlement, reference to "Mahmud" includes both Mahmud and his sister, Mariam, collectively.

had a reasonable opportunity to inspect the property referred to in paragraph 1.9);
and after the final MKT accounting referred to in paragraph 1.12.

Ex. 35, at 1-2. Mahmud received approximately $800,000 from the 2008 Settlement.

Additionally, Mahmud surrendered his interest in MKT to Hasan, Hasan relinquished any claims

on the Ridgefield house, and Mahmud paid Hasan $50,000 in exchange for a Maserati. Despite

the surrender of Mahmud's interest in MKT, Mahmud still managed MKT's businesses, including

Mulino and Western Royal.

D.      $168,800 PROMISSORY NOTE

In July 2008, prior to the 2008 Settlement, Makarenko gave Mahmud $168,800. Mahmud

and Makarenko executed a promissory note; however, the promissory note was between MKT and

Makarenko. Mahmud signed the promissory note as a member of MKT. The promissory note

was payable no later than August 1, 2010. According to Mahmud, on the advice of an immigration

attorney, Makarenko transferred the $168,800 to Mahmud to avoid potential tax issues in Ukraine

in the event she was deported.[3] According to Makarenko, Mahmud requested the funds from her

to pay legal fees incurred in the litigation with Hasan, and in return, Makarenko would receive a

50 percent interest in the proceeds received from the lawsuits, including in the Ridgefield house.

Even though the promissory note listed MKT as the payor, Hasan refused to allow MKT

to hold Makarenko's funds. Accordingly, Mahmud kept the funds in an individual checking

account. Makarenko did not understand that Mahmud signed as a member of MKT rather than in

---

[3] Makarenko, originally from Ukraine, was not yet a U.S. citizen in 2008, and had been in the U.S. on an expired visa.

his individual capacity. Mahmud never repaid the funds to Makarenko. According to Mahmud, he never spent the funds, and Makarenko never requested repayment.

E.      UKRAINE APARTMENTS

In 2009, Hasan gifted Mahmud and Makarenko two apartments in Ukraine, both valued at approximately $300,000. According to Mahmud, Hasan gifted the apartments to him because Hasan was happy that he and Mahmud were again working together following the 2008 Settlement. According to Makarenko, Hasan gifted both her and Mahmud the apartments as a wedding gift because Hasan had not attended their wedding.

Makarenko's mother and brother managed the apartments. Both apartments generated approximately $1,500 per month in rent between 2010 and 2020. Mahmud estimated that the total rental income between the two apartments over 10 years came to approximately $180,000. However, Mahmud claimed he never had access to the rental income because it was in the possession of Makarenko and her family. According to Makarenko, her mother sent rental income to Makarenko and Mahmud, which Makarenko then used for a family vacation in Thailand. When Mahmud asked Makarenko about rental income from the Ukraine apartments, Makarenko told him that he still possessed her $168,800.

F.      PURCHASE OF MULINO AND WESTERN ROYAL

In May 2010, Mahmud, through an entity called MSEI, LLC,[4] purchased Mulino from MKT for $1,635,000. Mahmud paid a down payment by transferring the Maserati from the 2008 Settlement, valued at $50,000, back to Hasan. Mahmud then assumed two loans on Mulino, with

---

[4] Mahmud is the only member of MSEI, LLC.

the remainder of the purchase price financed and "paid off through an additional loan [from] MKT." 1 Verbatim Rep. of Proc. (VRP) (Mar. 7, 2023) at 270. The two Mulino loans included a $1.1 million SBA[5] loan and a $39,000 bank loan.

In 2012, Mahmud, through an entity called Western Royal Inn, LLC,[6] purchased Western Royal for $1,250,000.[7] Mahmud paid a down payment of $186,805, followed by another $150,000 payment. Mahmud paid the $186,805 down payment with proceeds of the sale of his mother's home in Pakistan, which he had inherited. The $150,000 came from proceeds of the 2008 Settlement. Mahmud paid the remainder of the purchase price through a loan from MKT, which Mahmud later paid off.

Both Mulino and Western Royal had business bank accounts. Even though Makarenko was not a Mulino employee, she had a Mulino credit card and was listed as an account owner on the Mulino bank account. Mahmud had added Makarenko's name to the Mulino bank account to assist with Mulino's banking needs on an occasion when Mahmud had planned to travel abroad.

After Mahmud's purchase of Mulino and Western Royal, Mahmud and Hasan engaged in litigation again. They resolved their disputes through another settlement agreement (2015 Settlement). Under the 2015 Settlement, Hasan forgave "any and all interest and debt associated" with Mulino and Western Royal in exchange for a payment of $450,000 from Mahmud. Ex. 42, at 2. Mahmud paid the $450,000 from the proceeds of the 2008 Settlement.

---

[5] "SBA" stands for "Small Business Administration." *See* Loans, U.S. SMALL BUS. ADMIN., https://www.sba.gov/funding-programs/loans (last visited Oct. 22, 2025).

[6] Mahmud is also the only member of Western Royal Inn, LLC.

[7] Western Royal was owned by New West Investments, LLC, which was owned by MKT.

G.    SEPARATION AND PETITION FOR DISSOLUTION

Mulino and Western Royal provided the only sources of income for Mahmud and Makarenko.  Even though the businesses did not yield high profits, Mahmud was able to fund their lifestyle and pay for family expenses through revolving business lines of credit.

Prior to her move to the U.S., Makarenko had been a pediatrician in Ukraine.  Upon moving to the U.S., Makarenko initially registered for courses in medical English[8] so she could apply for a medical license.  However, she stopped taking the courses after finding an administrative job in payroll and accounting.  After her marriage to Mahmud, Makarenko did not seek employment.

During the marriage, Makarenko sold family artwork to auction houses.  Over time, Makarenko sold $300,000 to $400,000 worth of art.  According to Makarenko, during 2010 before the birth of S.M., Makarenko worked at Mulino.  Makarenko claimed she conducted inventory, found suppliers, and began renovating the Mulino convenience store.  After S.M. was born, Makarenko worked remotely coordinating with contractors.

In 2010, Makarenko also began remodeling the Ridgefield house.  The remodel took six years and cost approximately $500,000.  According to Makarenko, the remodel was paid for through both community funds and some insurance proceeds.  Additionally, Makarenko furnished the house with designer furniture with her own funds.

In March 2018, Mahmud and Makarenko filed a complaint against one of the contractors, Pavel's Tile, for defective services during the Ridgefield house remodel.  Mahmud and Makarenko

---

[8] Courses in medical English are designed for individuals who may have obtained a medical degree abroad, but who hope to apply for and obtain a medical license in the U.S.

later settled with Pavel's Tile, with Mahmud and Makarenko receiving $95,000 from the settlement.

On May 1, 2018, Mahmud and Makarenko separated. Initially, they lived in separate bedrooms in the Ridgefield house. Mahmud later moved out of the Ridgefield house and lived out of a guestroom at Western Royal.

In March 2019, Mahmud filed a petition for dissolution. In June 2019, the trial court issued a temporary order. The temporary order provided that Makarenko could reside at the Ridgefield house and that beginning in May 2019, Mahmud needed to pay $7,500 per month to Makarenko for spousal maintenance and child support. Additionally, the temporary order stated that Mahmud must pay for all Ridgefield house expenses, including the mortgage, insurance, and property taxes, for the family health insurance, and for Makarenko's health expenses, including some recent uninsured procedures Makarenko had. Mahmud's expenses exceeded the income listed on his tax returns; however, he paid for the expenses utilizing the revolving lines of credit from Mulino and Western Royal.

As for the temporary parenting plan,[9] S.M., who was eight years old at the time, primarily resided with Makarenko at the Ridgefield house. However, during the school year, Mahmud would pick up S.M. from school every Tuesday and Thursday, and he would have residential time with S.M. every other weekend from Thursday through Sunday. Mahmud was also responsible for all of S.M.'s expenses, including private school tuition and the cost of extracurricular activities.

---

[9] The temporary parenting plan is not part of the record on appeal.

No. 59637-7-II

## H. TRIAL

Trial was set for October 2021. However, it was continued several times at Makarenko's request.[10] The trial court ultimately held a seven-day trial, split between March 2023 and January 2024. During this time, Mahmud continued to make the $7,500 monthly support payments to Makarenko.

While the trial was pending, the trial court initially ordered that the $95,000 settlement proceeds from the Pavel's Tile lawsuit be distributed to Makarenko. However, in September 2023, Mahmud and Makarenko stipulated to splitting the proceeds equally between them. The stipulation was filed with the trial court and the trial court ordered:

> The parties shall direct attorney . . . to release all funds related to settlement in Mahmud v. Pavel's Tile, LLC, Clark County Superior Court Case No. 18-2-0061-16, currently held in [the] attorney trust account as follows: one-half (1/2) to MOHAMMAD MAHMUD and one-half (1/2) to NATALIYA MAKARENKO. The above release of funds shall be made via two (2) checks, one (1) to each party. If the above Stipulation is not sufficient direction by the parties for attorney . . . to release the settlement funds, then the parties are directed to authorize and sign any additional necessary document(s) to effectuate release of the funds. This Order shall be transmitted to attorney . . . after its entry and the parties shall promptly comply with any other steps necessary to release said funds.

Clerk's Papers (CP) at 22-23.

Following the stipulation, Makarenko filed a motion for the award of attorney fees. In October 2023, the trial court ordered Mahmud to pay $47,500—the equivalent of funds Mahmud received after splitting the Pavel's Tile settlement—to Makarenko for her attorney fees.

---

[10] Makarenko cited discovery violations, various health issues, and "high levels of stress and anxiety" for family members living in Ukraine as reasons for her requested continuances. Clerk's Papers (CP) at 80.

During trial, Mahmud, Makarenko, and several other witnesses and expert witnesses testified to the facts described above. In addition, the parties presented the following evidence.

1.      Mulino Testimony

In an April 2019 declaration, Makarenko stated that since 2009, she managed the Mulino gas station and store, including managing employees, distributors, and payroll. During trial, Makarenko testified that she was "familiar" with the workings of Mulino and named employees she recalled working at Mulino, including a "T.J.," "Sherry," and "Debby." 2 VRP (Mar. 8, 2023) at 605; 2 VRP (Jan. 23, 2024) at 953. Makarenko requested that Mulino be awarded to her.

Mahmud testified that he began establishing Mulino's business relationships with vendors in 2003 when he started managing Mulino and that all of Mulino's merchant accounts were under his name. Mahmud stated that Makarenko had not had any contact with Mulino since they separated in 2018. Additionally, Mahmud attempted to determine if the individuals Makarenko listed as prior Mulino employees had been on Mulino's payroll, but he could not find any evidence that a T.J., Sherry, or Debby had ever been employees.

Darshan Singh is the general manager at Mulino and has worked full time at Mulino since 2003. Singh testified that he sees Mahmud three to four times a week at the Mulino store. Singh is acquainted with Makarenko and has seen her on occasion, but Singh stated that Makarenko never worked at Mulino.

Cindy Burback has been the bookkeeper for Mulino and Western Royal since 2003. Burback testified about Mahmud's purchase of Mulino in 2010. Specifically, Burback stated that Mahmud paid a $50,000 down payment for Mulino via transfer of the Maserati to Hasan. Burback also noted that at the time of the Mulino purchase, Mulino was encumbered by significant loans,

which Mahmud assumed as part of his purchase. Additionally, Burback stated that Makarenko was never involved with management at Mulino nor was Makarenko ever on the Mulino payroll.

Burback also testified that she prepares the profit and loss (P&L) statements for Mulino, and for the last several years, Mulino has been "barely hanging on." 1 VRP (Mar. 6, 2023) at 92. For instance, in 2020, Mulino had a net income of approximately $58,000. In 2021, Mulino operated at a loss. On a 2022 balance sheet, Mulino's business savings account reflected approximately $1.3 million. However, Burback noted that the $1.3 million came from loans, a significant portion of which had to be repaid. Burback further testified about the revolving credit line, identified as "Shareholder Loans," which was utilized with Mulino vendors for cash flow purposes. 1 VRP (Mar. 6, 2023) at 97.

With regard to Mulino's 2022 tax return, Mahmud testified that Schedule L of the tax return is a balance sheet that lists business debts. For instance, the 2022 return shows that Mulino had approximately $800,000 in shareholder loans and approximately $1.2 million in "mortgages, notes, [and] bonds." Ex. 52, at 8.

Commercial appraiser Brian Coup testified as an expert witness regarding the value of Mulino. Coup provided an extensive explanation as to his methodology. His report included assumptions, calculations, and photos from a physical walkthrough of the property. Coup reviewed four years of P&L statements and some fuel volume reports, but he did not have other financial data. Coup valued Mulino at $1,750,000.

2.      Western Royal Testimony

Burback testified that Mahmud purchased Western Royal in 2012 and paid $186,805 as a down payment. Burback stated that the down payment came from Mahmud's inheritance and that

11

the funds came from the sale of a family home in Pakistan. Additionally, Burback was familiar with Mahmud's earnings between 2010 and 2012, and she stated that those earnings would have been insufficient to cover the subsequent $150,000 payment Mahmud made for the purchase of Western Royal. Burback also testified that Mahmud's $450,000 payment to Hasan following the 2015 Settlement could not have come from Mahmud's earnings from Mulino or Western Royal. Instead, Burback understood Mahmud's $450,000 payment to Hasan came from Mahmud's 2008 Settlement proceeds.

Western Royal has struggled as a business in recent years. Burback testified that while Western Royal's bank account appeared to have approximately $623,000 in cash, that cash came primarily from loans. Western Royal also carried lines of credit, or shareholder loans, similar to those carried by Mulino. Mahmud testified that Western Royal had approximately $700,000 worth of debt, as seen on Schedule L of its 2022 tax return.

Keenan O'Leary, a commercial appraiser who specializes in hotels and vineyards, testified about Western Royal's value. O'Leary conducted an appraisal of Western Royal in April 2023 and valued it at $1,150,000. O'Leary testified extensively regarding his methodology and the resulting appraisal report. O'Leary did not consider Western Royal's bank account funds as part of the appraisal.

3.     Business Distributions

Makarenko testified that during the pendency of the dissolution proceedings, Mahmud took regular draws from Mulino and Western Royal for personal use. Makarenko requested the trial court award her 50 percent of the total distributions Mahmud took.

4.      Proposed Parenting Plans

Both Mahmud and Makarenko sought shared custody of S.M.  Makarenko proposed what amounted to a month-on/month-off living arrangement for S.M. with Makarenko as the primary custodial parent.  However, during Makarenko's months with S.M., Mahmud would still pick S.M. up from school every Tuesday and Thursday, and S.M. would spend every other weekend with Mahmud.  During Mahmud's months with S.M., S.M. would remain exclusively with Mahmud. Makarenko's proposal was based, in part, on her desire to regularly travel abroad to care for her aging parents.  In the alternative, Makarenko proposed a two week-on/two week-off residential schedule for S.M. with Makarenko and Mahmud jointly making major education and healthcare decisions.

Mahmud proposed a week-on/week-off living arrangement for S.M.  If Makarenko traveled abroad or otherwise more than 50 miles away for more than 48 hours during her residential time with S.M., Mahmud proposed that S.M. either reside with him, or Makarenko needed to communicate her travel plans with Mahmud more than 72 hours in advance.  Mahmud also requested that he be granted sole authority to make education and healthcare decisions for S.M.

5.      Child Support and Income Figures

Makarenko's primary source of income was the $7,500 monthly support payments from Mahmud.  Makarenko stated that $1,500 of the monthly support payments could reasonably be allocated to child support, while the remaining $6,000 constituted a maintenance payment or alimony.  Mahmud estimated that over the course of five years, he had paid between $450,000 and $500,000 to Makarenko in support payments.  Mahmud requested the trial court to take that amount into consideration when issuing its final orders.

13

Over the course of the proceedings, Makarenko did not seek full-time employment. In March 2023, Makarenko cited health reasons for not seeking employment. However, in January 2024, Makarenko testified that she did not have any health barriers or handicaps when asked about her ability to run Mulino if she were awarded the business. Additionally, Makarenko testified that she served as a "global brand ambassador" for Christie's Real Estate at some point in 2023. 2 VRP (Jan. 23, 2024) at 947.

For child support, Makarenko proposed that if each party was "awarded a business and they share equal residential time [with S.M.]," no child support was necessary and "each party should be ordered to pay 50% of [S.M.'s] expenses." CP at 190.

Mahmud, on the other hand, proposed that the trial court designate monthly incomes of $10,507.03 and $4,429.28 to him and Makarenko, respectively. Because Mahmud does not receive a traditional paycheck, Mahmud based his income figure "[b]y computing the cost of certain fixed expenses over the course of" the dissolution proceedings. CP at 100. Mahmud added together his "verified expenses" of the $7,500 monthly support to Makarenko, the mortgage payment on the Ridgefield house ($1,360.41), and the monthly health insurance cost ($1,646.62). CP at 101. Mahmud imputed an income to Makarenko based on the median hourly wage of various positions related to her past work. In light of the difference between incomes, Mahmud proposed he make monthly payments of $230.50 to Makarenko for child support.

6. Trial Court Ruling

In February 2024, the trial court issued its ruling.

#### a. Ridgefield house

##### i. Characterization

The trial court found that West Coast Ridgefield Properties purchased the Ridgefield house in 2006 and that Mahmud quitclaimed the house to himself individually prior to marriage. However, the trial court noted the 2008 Settlement, in which there was a possible dispute regarding the ownership interest in the Ridgefield house, along with Makarenko's contention that her $168,800 loan to Mahmud was in return for 50 percent of the 2008 Settlement proceeds. The trial court also acknowledged the funds expended by both Mahmud and Makarenko toward improving the Ridgefield house. Accordingly, the trial court found "it is more likely than not that the [Ridgefield house] was acquired . . . after the date of marriage, meaning after the date of the . . . settlement agreement. So that's December 31st, 2008. Therefore, it is community in nature." 3 VRP (Feb. 16, 2024) at 1334. The trial court also found that the mortgage on the home, or $417,000, was "used to benefit the community." 3 VRP (Feb. 16, 2024) at 1335.

##### ii. Valuation

The trial court valued the Ridgefield house at $2 million.[11] Additionally, the trial court found that "it is . . . more likely than not" that Mahmud contributed separate property toward the acquisition of the Ridgefield house. 3 VRP (Feb. 16, 2024) at 1334. Therefore, the trial court determined that Mahmud was entitled to reimbursement for his separate property contribution.

After finding that the Ridgefield house was purchased for $1.7 million in 2006, and that Mahmud took a $417,000 mortgage against the home, the trial court estimated Mahmud's separate

---

[11] Both parties had expert witnesses testify to the current value of the Ridgefield house. The trial court adopted a figure based on Mahmud's expert's appraisal.

property contribution to be approximately $1.3 million. However, the trial court based the $1.3 million value on Section 1.1 of the 2008 Settlement. The trial court declined to deduct the mortgage amount from Mahmud's reimbursement value "because it's clear that that mortgage amount, it was so close in time to the marriage and the funds were used to benefit the community." 3 VRP (Feb. 16, 2024) at 1335.

   b. Mulino

    i. Characterization

The trial court determined that Mulino, based on its purchase date in 2010, constituted community property. However, similar to the Ridgefield house, the trial court found that Mahmud was entitled to reimbursement for his separate property contribution. The trial court found that Mahmud contributed $450,000 in separate funds to the purchase of Mulino and was entitled to reimbursement of that amount.

    ii. Valuation

The trial court accepted Coup's appraisal of Mulino at $1,750,000. The trial court then deducted some of Mulino's debts—specifically the "CIT loan, merchant lines of credit, and accounts payable," which totaled approximately $975,000. 3 VRP (Feb. 16, 2024) at 1338. The trial court declined to deduct all of the debt that Mahmud had requested. The trial court calculated the resulting value of Mulino to be $775,000.

c.      Western Royal

i.      Characterization

Based on the 2012 purchase date, the trial court also characterized Western Royal as community property. The trial court again found that Mahmud was entitled to reimbursement for his separate property contribution and that he should be reimbursed $186,000.

ii.      Valuation

The trial court accepted O'Leary's appraisal of Western Royal at $1.15 million. The trial court declined to deduct all of the debt that Mahmud had requested, but the court did deduct "the merchant lines of credit, the accounts payable, and the credit cards, Visa and Amex." 3 VRP (Feb. 16, 2024) at 1339. After deduction of the debt, the trial court valued Western Royal at approximately $820,000.

d.      Ukraine apartments

The trial court found that the Ukraine apartments "were more likely than not a wedding gift"; thus, they were community in nature. 3 VRP (Feb. 16, 2024) at 1336. The trial court noted that the apartments were difficult to value in light of the ongoing war in Ukraine, but that during trial, there was testimony that the apartments provided rental income of approximately $180,000 over several years. The trial court valued the two apartments at $180,000.

e.      Distribution of assets

The trial court awarded the Ridgefield house to Mahmud. Because the Ridgefield house constituted community property, the trial court stated that Makarenko would be entitled to half the equity after factoring in Mahmud's separate property contribution "and the debt owed on the

17

property." 3 VRP (Feb. 16, 2024) at 1341. The trial court calculated Makarenko's share to be approximately $130,000.

The trial court also awarded both Mulino and Western Royal, and their associated bank accounts, to Mahmud. Because Mulino and Western Royal were both characterized as community property, Makarenko received approximately $160,000 for Mulino and $318,000 for Western Royal in equalization payments. In both cases, the trial court deducted Mahmud's separate property contributions and the associated debts from the business values.

Mahmud and Makarenko each received a Ukraine apartment. However, the trial court stated that it "will also require a 50 percent offset of the $180,000 in rents received from the Ukraine apartments. So that will reduce Mr. Mahmud's equalization payment [to Makarenko] by 90,000." 3 VRP (Feb. 16, 2024) at 1343. The trial court also reduced Mahmud's equalization payment to Makarenko by $47,500 based on the Pavel's Tile settlement.

The trial court declined to require Mahmud repay Makarenko's $168,800 loan. The trial court stated that Makarenko's loan "was to an MKT Investments" and "from the evidence supplied, the Court finds that those funds were . . . largely, if not entirely, used to benefit the community." 3 VRP (Feb. 16, 2024) at 1343. Makarenko was ultimately awarded approximately $470,000 in equalization payments after the trial court distributed the assets.

The trial court also accounted for the support payments Mahmud made to Makarenko during the pendency of the dissolution proceedings. The court declined to award spousal support to Makarenko going forward.

f.     Parenting plan and child support

The trial court discussed the factors it considered when it established the parenting plan and how those factors applied to Mahmud and Makarenko's circumstances.  The trial court expressed concern over Makarenko's proposed parenting schedule.  Specifically, the trial court noted that a schedule tied to Makarenko's intended travel plans may "not [be] in [S.M.]'s best interest."  3 VRP (Feb. 16, 2024) at 1351.

The trial court determined that, based on "the facts and circumstances involved in this particular case," Mahmud should be the custodial parent.  3 VRP (Feb. 16, 2024) at 1352.  The trial court mostly adopted Mahmud's proposed parenting plan and awarded Mahmud the ability to make major education and healthcare decisions based, in part, on Makarenko's "anticipated significant international travel."  3 VRP (Feb. 16, 2024) at 1352.

In the final parenting plan, the trial court wrote:

[S.M.] is scheduled to live with each parent on a week-on/week-off basis with exchanges on Sunday at 5:00 p.m.  If Mother travels to Spain or is otherwise more than fifty (50) miles away from Father's residence for forty-eight (48) hours or longer during her residential time, then [S.M.] shall reside with Father, unless the parents agree otherwise, in writing; agreement shall be reasonable and account for extracurricular activities or short weekend trips.  [A]ny such absences shall be communicated to Father at least seventy-two (72) hours in advance.

CP at 59.

As for child support, the trial court adopted Mahmud's income figures.  The trial court noted it was difficult to determine Mahmud's exact income, and "absent pay stubs," Mahmud's proposed income calculation served as a viable alternative.  3 VRP (Feb. 16, 2024) at 1353.  Because no evidence was presented as to Makarenko's income, the superior court found it

19

appropriate to impute the "census-level data figures" that Mahmud had proposed. 3 VRP (Feb. 16, 2024) at 1353.

> g.      Business loans and distributions

The trial court noted that based on the evidence presented during trial and bank statements submitted as exhibits, it was "very challenging to decipher what [the distributions] were for." 3 VRP (Feb. 16, 2024) at 1363. The trial court declined to deduct all business loans from the value of Mulino and Western Royal. Specifically, the trial court stated:

> There were, for example, the SBA loan[s]. I did not deduct those from the value of the businesses because I did not find sufficient evidence to support, one, that they were the amounts that were offered; and, two, that they were still in existence in the same shape and format. I think during testimony, Mr. Mahmud was asked, Well, what is still remaining, and [he] had difficulty recalling that. I mean, that could be for a number of reasons.

> But then there's the COVID-related loans that were out there. Maybe some of those were forgiven, maybe not. I don't—I simply don't know. So the Court did its best to accept . . . the deduction from values of clear—what it felt to be, more likely than not, debt that truly did exist.

3 VRP (Feb. 16, 2024) at 1362-63.

> h.      Final orders

In March 2024, the trial court entered a final dissolution order, a final parenting plan, and a final child support order. Following entry of the orders, Makarenko filed a motion for reconsideration of the final dissolution order.[12] Makarenko cited CR 59(a)(7), arguing that "no

---

[12] Even though Makarenko only identified the final divorce order in her motion for reconsideration, she appears to also have requested reconsideration of the final parenting plan and final child support order as well.

evidence or reasonable inference from the evidence presented" justified the trial court's decision. CP at 159. The trial court denied the motion.

Makarenko appeals.

## ANALYSIS

Makarenko raises several challenges to the trial court's final dissolution order, final parenting plan, and final child support order. Makarenko's challenges generally fall within the following categories: the right to reimbursement, property valuations, equalization payments, and parenting plan/child support. Makarenko also argues that the trial court judge was biased in favor of Mahmud and requests a new judge in the event we reverse and remand any aspect of this case.

A.    STANDARD OF REVIEW IN DISSOLUTION PROCEEDINGS

In dissolution proceedings, courts must make a "just and equitable" distribution of the parties' property and liabilities, whether community or separate. RCW 26.09.080; *In re Marriage of Larson*, 178 Wn. App. 133, 137, 313 P.3d 1228 (2013), *review denied*, 180 Wn.2d 1011 (2014). "The character of property . . . is determined at the time of acquisition." *In re Marriage of Schwarz*, 192 Wn. App. 180, 189, 368 P.3d 173 (2016). Courts presume that property acquired during marriage is community property. *Id.* However, the presumption may be rebutted through clear and convincing evidence that the property was acquired using separate funds. *Id.*

When dividing assets, courts must consider "all relevant factors," which include:

> (1) The nature and extent of the community property;
> (2) The nature and extent of the separate property;
> (3) The duration of the marriage . . . ; and
> (4) The economic circumstances of each spouse . . . at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse . . . with whom the children reside the majority of the time.

RCW 26.09.080.

Trial courts have broad discretion to determine what is just and equitable based on the facts of each case. *In re Marriage of Doneen*, 197 Wn. App. 941, 949, 391 P.3d 594, *review denied*, 188 Wn.2d 1018 (2017). A "'[j]ust and equitable distribution does not mean that the court must make an equal distribution.'" *Larson*, 178 Wn. App. at 138 (quoting *In re Marriage of DewBerry*, 115 Wn. App. 351, 366, 62 P.3d 525, *review denied*, 150 Wn.2d 1006 (2003)). Further, a "just and equitable division 'does not require mathematical precision, but rather fairness, based upon a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of parties.'" *Id.* (quoting *In re Marriage of Crosetto*, 82 Wn. App. 545, 556, 918 P.2d 954 (1996)). Fairness is not attained by utilizing inflexible rules; rather, it is achieved through consideration of all the circumstances and the exercise of discretion. *Id.*

"Because the trial court is in the best position to determine what is fair, this court will reverse its decision only if there has been a manifest abuse of discretion." *Doneen*, 197 Wn. App. at 949. A trial court abuses its discretion "if it bases its decision on untenable grounds or acts for untenable reasons or if the decision is manifestly unreasonable." *In re Marriage of Byerley*, 183 Wn. App. 677, 685, 334 P.3d 108 (2014).

> A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard.

*In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997). A trial court abuses its discretion if a finding from which the court has drawn a conclusion of law is not supported by

substantial evidence. *Byerley*, 183 Wn. App. at 685. Substantial evidence is evidence that "would persuade a rational, fair-minded person of the finding's truth." *Id.* "Trial court decisions in dissolution proceedings will seldom be changed on appeal." *In re Marriage of Stenshoel*, 72 Wn. App. 800, 803, 866 P.2d 635 (1993).

B.     RIGHT OF REIMBURSEMENT FOR SEPARATE PROPERTY CONTRIBUTIONS

Makarenko argues that Mahmud was not entitled to a right of reimbursement on the Ridgefield house, Mulino, or Western Royal. Specifically, Makarenko asserts there was not clear and convincing evidence of Mahmud's separate property contributions to those assets. Mahmud argues that his right to reimbursement, and the amounts of reimbursement, are supported by "substantial evidence." Br. of Resp't at 33.

1.     Legal Principles

The right of reimbursement is an equitable remedy "in favor of one who is clearly shown to have contributed separate funds to [the] acquisition or to the enhancement of" community property. *Farrow v. Ostrom*, 16 Wn.2d 547, 556, 133 P.2d 974 (1943); *see also Lindemann v. Lindemann*, 92 Wn. App. 64, 74, 960 P.2d 966 (1998), *review denied*, 137 Wn.2d 1016 (1999); *In re Marriage of DeHollander*, 53 Wn. App. 695, 699, 770 P.2d 638 (1989) (stating "a spouse who contributes separate property to improve community property may have a right of reimbursement").

In this context, the proponent of reimbursement must establish with clear and convincing evidence the separate nature of the funds contributed, along with the amount, to be entitled to any reimbursement. *Schwarz*, 192 Wn. App. at 189 ("Property *acquired* during marriage is presumptively community property. A party may rebut this presumption by offering clear and

23

convincing evidence that the property was acquired with separate funds." (Emphasis in original));
*see DeHollander*, 53 Wn. App. at 699-700;. Clear and convincing evidence does not require
"irrefutable evidence." *Schwarz*, 192 Wn. App. at 218. Instead, the standard requires "positive
evidence, direct or circumstantial, that makes a proposition highly probable." *Id.*

In dissolution proceedings, clear and convincing evidence cannot be established through
the self-serving testimony of a single party. *Berol v. Berol*, 37 Wn.2d 380, 382, 223 P.2d 1055
(1950); *Schwarz*, 192 Wn. App. at 189. The party's testimony must be supported, such as through
"documentary evidence, an admission by their party-opponent, or the testimony of another
witness." *Schwarz*, 192 Wn. App. at 215.

2.      Ridgefield House

a.      Right of reimbursement

The record shows that Mahmud, as sole member of West Coast Ridgefield Properties,
purchased the Ridgefield house for $1.7 million in 2006. He paid a $50,000 down payment, and
the remainder came from the proceeds of the sale of his grandfather's house in Pakistan, which
Mahmud had inherited. The record also shows that on March 10, 2008, Mahmud quitclaimed the
Ridgefield house from West Coast Ridgefield Properties to himself individually. The following
day, Mahmud took out a mortgage of $417,000 on the Ridgefield house. Then, Mahmud and
Makarenko married on March 30, 2008. Because the mortgage was taken out so close in time to
the marriage, the trial court found that the mortgage was to benefit the community.

In 2008, after Mahmud and Makarenko married, Mahmud and Hasan disagreed as to who
owned the Ridgefield house. However, Mahmud and Hasan settled in December 2008, and title
was quieted in Mahmud's name. Because title was quieted after Mahmud and Makarenko married,

and based on other expenditures Mahmud and Makarenko both made on the house, the trial court characterized the Ridgefield house as community property with Mahmud entitled to reimbursement for his separate property contribution. The trial court valued Mahmud's separate property reimbursement at $1.3 million based on Section 1.1 of the 2008 Settlement.

Here, the record contains both documentary evidence and testimony that Mahmud was the sole member of West Coast Ridgefield Properties and that Mahmud paid the purchase price for the Ridgefield house before his marriage to Makarenko. Makarenko does not dispute the $1.7 million purchase price or argue that she contributed funds to the purchase of the Ridgefield house. Thus, clear and convincing evidence demonstrates that Mahmud contributed separate funds towards the purchase of the Ridgefield house. *Schwarz*, 192 Wn. App. at 214-15. Because the record contains clear and convincing evidence of Mahmud's contribution of separate funds, the trial court did not err when it determined that Mahmud was entitled to reimbursement for the amount of separate funds he contributed. *Doneen*, 197 Wn. App. at 949; *DeHollander*, 53 Wn. App. at 699-700.

Makarenko also argues that the trial court applied an incorrect standard when determining Mahmud was entitled to reimbursement. Specifically, Makarenko assigns error to the trial court's oral ruling that Mahmud "'more likely than not'" contributed separate assets to the Ridgefield house purchase. Reply Br. of Appellant at 13 (boldface omitted) (quoting 3 VRP (Feb. 16, 2024) at 1334, 1336).

Makarenko is correct that a right to reimbursement must be established through clear and convincing evidence. *Schwarz*, 192 Wn. App. at 189; *see DeHollander*, 53 Wn. App. at 699-700. However, regardless of the trial court's wording, there is clear and convincing evidence of

Mahmud's separate contribution to the purchase of the Ridgefield house. *Davis v. Arledge*, 27 Wn. App. 2d 55, 64, 531 P.3d 792 (2023) ("We may affirm the trial court on any basis supported by the record.").

Even Makarenko acknowledges Mahmud's right of reimbursement in her brief: "Admittedly, there is an argument that it could be inferred that there is a right of reimbursement given that the [2008 Settlement] was entered into so soon after marriage." Br. of Appellant at 15. However, Makarenko then argues that the record fails to establish the amount of Mahmud's reimbursement by clear and convincing evidence. Specifically, Makarenko asserts that the trial court's reference to Section 1.1 of the 2008 Settlement "bears no connection to the value of the [Ridgefield house] at that time or Mr. Mahmud's interest in the home." Br. of Appellant at 15.

b.      Reimbursement amount

Makarenko is correct that Section 1.1 of the 2008 Settlement is unrelated to the value of the Ridgefield house. Section 1.1 discusses only different monetary values that would change hands depending on the performance of certain obligations. Nor does Section 1.1 reference Section 1.4 of the 2008 Settlement, which is the provision that relates to ownership of the Ridgefield house. Moreover, Section 1.1 refers to Mahmud and his sister collectively receiving approximately $1.7 million, not Mahmud individually receiving $1.3 million. Thus, the trial court erred when it referenced Section 1.1 as the basis for its valuation of Mahmud's reimbursement. *Littlefield*, 133 Wn.2d at 47.

However, the trial court's valuation of Mahmud's reimbursement amount still matches the Ridgefield house purchase price with the mortgage deducted. Based on the clear and convincing evidence in the record, Mahmud purchased the Ridgefield house for $1.7 million and then took

out a $400,000 mortgage. The $1.3 million is the resulting reimbursement value after deducting the mortgage from the purchase price. Thus, because the record supports a $1.3 million reimbursement value based on the Ridgefield house purchase price with the mortgage amount deducted—values that Makarenko does not dispute—the trial court properly determined that Mahmud is entitled to a $1.3 million reimbursement for his separate property contribution to the Ridgefield house.

Makarenko also argues that even if this court determines Mahmud is entitled to reimbursement, the trial court erred when it "refuse[d] to deduct" the mortgage from the reimbursement value of $1.3 million. Br. of Appellant at 19. Makarenko contends that Mahmud's reimbursement amount must be reduced by the amount of the mortgage.

Here, the record shows that, before marriage, Mahmud took out a $417,000 mortgage the day after he transferred title on the Ridgefield house from West Coast Ridgefield Properties to himself individually, and there is nothing in the record demonstrating how the mortgage funds were used. The trial court found that because the mortgage was taken "so close in time to the marriage," "the funds were used to benefit the community."[13] 3 VRP (Feb. 16, 2024) at 1335.

Although the trial court abused its discretion in relying on Section 1.1 of the 2008 Settlement to find that Mahmud was entitled to $1.3 million for his contribution of separate property to the Ridgefield house, the record includes clear and convincing evidence that Mahmud is entitled to a separate property contribution reimbursement of $1.3 million. Again, Makarenko does not dispute the $1.7 million purchase price or argue that she contributed funds to the purchase

---

[13] The trial court awarded the $400,000 mortgage debt to Mahmud.

of the Ridgefield house. However, Makarenko assumes the $1.3 million includes the $400,000 mortgage that should be Mahmud's separate debt and contends that "if the $1.3 million right of reimbursement is upheld, then it would be inequitable to have Ms. Makarenko pay for what amounts to one-half of Mr. Mahmud's separate debt." Br. of Appellant at 19. Makarenko does not elaborate or offer her own calculation; instead, Makarenko seems to assume the $400,000 mortgage is included in the $1.3 million value. This is error. As discussed above, $1.3 million is the result of the purchase price ($1.7 million) with the mortgage amount (approximately $400,000) deducted. Thus, the trial court did not err in determining Mahmud's separate property contribution for the Ridgefield house was $1.3 million.

     3.     Mulino

Makarenko argues that the trial court erred in granting Mahmud "*any right* of reimbursement with respect to Mulino" because the record does not support an entitlement to a $450,000 reimbursement for Mulino. Br. of Appellant at 17 (emphasis added). Here, the record shows Mahmud purchased Mulino in 2010 for $1,635,000. The trial court characterized Mulino as community property. This was appropriate given the community property presumption that arises for assets acquired during marriage. *Schwarz*, 192 Wn. App. at 189.

Both Mahmud and Burback testified that Mahmud paid a $50,000 down payment and then assumed loans for the remainder of the purchase price. The $50,000 down payment was made in the form of the Maserati from the 2008 Settlement. Both Mahmud and Burback testified to this fact, and the record contains documentary evidence that Mahmud and Hasan valued the Maserati at $50,000. Thus, there is clear and convincing evidence that Mahmud contributed separate funds to the acquisition of Mulino. *Schwarz*, 192 Wn. App. at 214-15. Accordingly, the trial court did

not err in ruling that Mahmud is entitled to a reimbursement for separate funds he contributed to the purchase of Mulino.

Makarenko's primary dispute lies with the value of Mahmud's reimbursement for Mulino. Makarenko acknowledges that Mahmud paid a $50,000 down payment. The trial court found that Mahmud contributed $450,000 of separate funds to purchasing Mulino. However, the trial court did not incorporate Mahmud's $50,000 down payment into the reimbursement amount.

Mahmud and Burback both testified that the $450,000 came from the 2008 Settlement proceeds. Thus, the record contains clear and convincing evidence that the $450,000 constituted Mahmud's separate funds. However, Mahmud failed to show that he contributed $450,000 of separate funds to Mulino alone. Thus, the trial court's ruling as to the amount of reimbursement was not supported by the evidence.

The trial court appears to have derived the $450,000 reimbursement value from the 2015 Settlement. As noted above, the $450,000 was the amount that Mahmud paid Hasan to settle interests in both Mulino and Western Royal. However, there is nothing in the record that shows how the $450,000 payment was applied between the two businesses or if any of the $450,000 was spent on the acquisition of Mulino.

While there is clear and convincing evidence that the $450,000 constituted Mahmud's separate funds, the record does not contain clear and convincing evidence that the entire $450,000, or even only a portion of the amount, was used to acquire Mulino. Indeed, the record only supports that Mahmud contributed $50,000 as a down payment for the purchase of Mulino by transferring the Maserati to Hasan, which the trial court failed to address. To be entitled to any reimbursement, the proponent of reimbursement must establish with clear and convincing evidence not only the

separate nature of the funds contributed but also the amount. *Schwarz*, 192 Wn. App. at 189; *see DeHollander*, 53 Wn. App. at 699-700. Therefore, because the trial court's ruling is not supported by the evidence, we hold that the trial court abused its discretion in determining that Mahmud's contribution of separate property to the purchase of Mulino was $450,000. Accordingly, we reverse the trial court's determination that Mahmud is entitled to a $450,000 reimbursement amount for Mulino.

4. Western Royal

Makarenko argues there is not clear and convincing evidence that Mahmud was entitled to any reimbursement for Western Royal. Here, the record shows Mahmud purchased Western Royal in 2012 for $1,250,000. Mahmud paid a down payment of $186,805, quickly followed by another $150,000 payment.

The trial court characterized Western Royal as community property. Similar to the trial court's ruling for Mulino, this was appropriate given the community property presumption for assets acquired during the marriage. *Schwarz*, 192 Wn. App. at 189. The trial court also found that Mahmud contributed $186,000 of separate property to the acquisition of Western Royal.

The record shows Mahmud paid the $186,805 down payment with proceeds from the sale of his mother's home in Pakistan, which he had inherited. Makarenko asserts that there is nothing in the record, other than Mahmud's "self-serving" statements, that demonstrates the source of the $186,000 was from the sale of Mahmud's mother's house. Br. of Appellant at 18. However, Mahmud's testimony about the source was supported by the testimony of Burback. *Schwarz*, 192 Wn. App. at 214-15.

The record also contains the Western Royal Purchase and Sale Agreement, which states that Mahmud paid a $186,805 down payment. Additionally, Burback testified that Mahmud would not have had access to $150,000 in liquid funds (the amount of Mahmud's second payment for Western Royal) from his earnings. Thus, if Mahmud did not have access to $150,000 in liquid funds, it follows he would not have had access to $186,805 in liquid funds from his earnings either.

Makarenko faults Mahmud for failing to produce documents that evidence the $186,805 came from separate funds. However, Makarenko does not offer any alternative source of the funds. The implication of her argument appears to be that Mahmud tapped into community funds for Western Royal's down payment, yet she fails to identify anywhere in the record, beyond her own self-serving statements, that might support this contention.

Clear and convincing evidence does not require "irrefutable evidence." *Schwarz*, 192 Wn. App. at 218. Instead, the standard requires "positive evidence, direct or circumstantial, that makes a proposition highly probable." *Id.* Given the testimony about Mahmud's business dealings with Hasan, and the evidence that Mahmud would not have had access to significant liquid funds, it is highly probable that the $186,805 down payment came from the sale of Mahmud's mother's house. *Id.* Because it is highly probable that Mahmud used separate funds to purchase Western Royal, we hold that the trial court did not abuse its discretion when it determined that Mahmud was entitled to reimbursement of $186,000.

C.    PROPERTY VALUATIONS AND EQUALIZATION PAYMENTS

1.    Businesses

Makarenko argues that when the trial court valued Mulino and Western Royal for the purposes of determining her equalization payments, the trial court failed to properly incorporate

31

certain debts and the values of business bank accounts. Makarenko contends her equalization payments from the businesses should have been much higher based on Schedule L of the businesses' 2022 tax returns.

We agree that the trial court erred when it failed to include certain debts and business bank account values when calculating Makarenko's equalization payments. However, because the trial court achieved a "just and equitable distribution" in regard to the equalization payments arising from the businesses, we affirm the trial court's calculation method for Makarenko's equalization payments. *Larson*, 178 Wn. App. at 138.

a. Mulino

Makarenko asserts the trial court "included higher debt than what is listed on Schedule L of [Mulino's] 2022 tax return and failed to include in the calculation the value of the bank accounts that [the trial court] awarded to Mr. Mahmud." Br. of Appellant at 21. Accordingly, Makarenko argues that her resulting equalization payment should have been "considerably higher." Br. of Appellant at 22. Mahmud agrees that the trial court erred in not including certain debts in its valuation of Mulino; however, Mahmud argues the error was made harmless by the trial court's exclusion of Mulino's bank accounts from the valuation.

During trial, Burback testified that when Mahmud bought Mulino, he assumed an SBA loan of approximately $1.1 million, known as the "CIT SBA loan." 1 VRP (Mar. 6, 2023) at 97. Mahmud testified that approximately $200,000 of that loan remained. Burback stated that another one of Mulino's outstanding loans was a COVID-19 Economic Injury Disaster Loan (EIDL).[14]

---

[14] The COVID-19 EIDL program "provided loans and advances to help businesses recover from the economic impacts of the pandemic." *COVID-19 Economic Injury Disaster Loan*, U.S. SMALL

Burback identified the EIDL as the "SBA COVID-19 loan," noted on Mulino's 2022 balance sheet, at $1,022,115 as of September 2022. 1 VRP (Mar. 6, 2023) at 144. The SBA COVID-19 loan is also reflected on Schedule L of Mulino's tax return. Mahmud and Burback also testified extensively to Mahmud's revolving line of credit, identified as "[s]hareholder [l]oans," with Mulino vendors. 1 VRP (Mar. 6, 2023) at 97. The record also contains testimony that most of the cash in Mulino's bank accounts "came all from two [SBA] loans," a significant portion of which needs to be repaid. 1 VRP (Mar. 6, 2023) at 96.

Here, the trial court accepted the appraisal value of $1.75 million for Mulino. Makarenko does not dispute the $1.75 million figure. However, in addition to Mahmud's reimbursement value, the trial court deducted only the CIT SBA loan, the merchant lines of credit (the shareholder loans), and the accounts payable. The trial court did not incorporate the SBA COVID-19 loan, citing insufficient evidence to determine if the loan was still in existence or in the same shape and format as testified to. Additionally, the trial court did not include Mulino's bank accounts in its valuation.

A trial court abuses its discretion if there is not substantial evidence in the record to support its findings. *Byerley*, 183 Wn. App. at 685. Substantial evidence "persuade[s] a rational, fair-minded person of the finding's truth." *Id.*

As discussed above, the record contains testimony from Burback and Mahmud regarding Mulino's loans and how those loans were reflected on various balance sheets, including Schedule L of Mulino's tax return. For instance, on Mulino's 2022 balance sheet, the Mulino savings

BUS. ADMIN., https://www.sba.gov/funding-programs/loans/covid-19-relief-options/eidl (last visited Oct. 22, 2025).

account reflected approximately $1.3 million in cash. However, that cash "came all from two [SBA] loans," much of which needed to be repaid. 1 VRP (Mar. 6, 2023) at 96. Thus, even if the trial court erred in excluding the SBA loans and bank account values, the record suggests that the excluded loans and bank account cash more or less offset one another, amounting to a wash. Also, the trial court did not deduct all of the debt that Mahmud requested. The trial court's point regarding insufficient evidence to determine whether the SBA loans were still in existence or in the same format as testified to is well-taken—the parties did not submit documentary evidence showing exact figures for the loans.

Makarenko proposes the equalization payment she thinks she should have received based on Schedule L of Mulino's 2022 tax return. We note that Makarenko failed to include the shareholder loans,[15] also listed on Schedule L, in her calculations; thus, her resulting equalization payment argued for on appeal would be significantly less than she contends.

Nevertheless, a trial court's primary consideration is a "just and equitable" distribution of property and courts have broad discretion to determine what is just and equitable in the circumstances. RCW 26.09.080; *Larson*, 178 Wn. App. at 137-38. Here, after the trial court characterized Mulino as community property, valued it, and deducted Mahmud's reimbursement

---

[15] Makarenko argues for the first time in reply that the trial court erred when it deducted the shareholder loans from the value of the businesses. "An issue raised and argued for the first time in a reply brief is too late to warrant consideration." *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Moreover, based on Mahmud's and Burback's testimony that the shareholder loans were revolving lines of credit that needed to be paid back to vendors, along with the reflection of the shareholder loans on the business tax returns, substantial evidence in the record shows that the trial court appropriately deducted the shareholder loans from the value of the businesses.

amount,[16] it awarded Makarenko half of the value. This does not strike us as "unfair, unjust or inequitable." *In re Marriage of Brady*, 50 Wn. App. 728, 732, 750 P.2d 654 (1988). Thus, because the record suggests that the SBA loans and bank account cash offset one another and because the distribution was just and equitable, the trial court did not abuse its discretion when it excluded the SBA loans and bank account cash when it valued Mulino and calculated Makarenko's equalization payment.

> b. Western Royal

Makarenko likewise asserts that the trial court erred in calculating her equalization payment for Western Royal when it "fail[ed] to include greater debt than is listed on [Western Royal]'s Schedule L . . . and fail[ed] to include . . . the value of the business bank accounts." Br. of Appellant at 23. Makarenko contends that her equalization payment for Western Royal should have been considerably greater.

The record contains testimony from Burback that Western Royal's savings account contained over $600,000 in cash. That savings account was comprised of two loans, one of which was an EIDL (or SBA COVID-19 loan). The Western Royal balance sheet shows that the SBA COVID-19 loan was approximately $500,000. This balance is also reflected on Schedule L of Western Royal's 2022 tax return. Similar to the case with Mulino, Burback testified the SBA COVID-19 loan was still outstanding.

The trial court accepted the appraised value of Western Royal at $1.15 million. Makarenko does not dispute the appraisal.

---

[16] We note that in light of our reversal of Mahmud's reimbursement amount for Mulino, the ultimate calculation of Makarenko's equalization payment will differ from its current value.

In calculating the equalization payment, the trial court deducted "the merchant lines of credit, the accounts payable, and the credit cards, Visa and Amex, for the inn." 3 VRP (Feb. 16, 2024) at 1339. The trial court did not incorporate the SBA COVID-19 loan or the bank accounts. There is no record as to why the trial court accounted for other debts but did not account for the SBA COVID-19 loan or the bank accounts. However, as was the case with Mulino, the record shows that the cash in Western Royal's bank account primarily came from loans. Thus, as with Mulino, it is reasonable to infer that the loans and the bank account cash more or less offset one another, again amounting to a wash.[17]

As stated above, the ultimate consideration for distributions is what is just and equitable in the circumstances. A distribution does not need to be mathematically precise; it simply needs to be fair. *Doneen*, 197 Wn. App. at 949. Similar to the valuation with Mulino, the trial court valued Western Royal, deducted Mahmud's reimbursement amount, and then awarded Makarenko half the remaining value based on its community property characterization. This is not patently unfair. Thus, because the record again suggests that the SBA loans and bank account cash offset one another and because the distribution was just and equitable, we affirm the trial court's exclusion of the SBA loans and bank account cash when it valued Western Royal and awarded Makarenko her equalization payment accordingly.

---

[17] Makarenko also proposes the equalization payment she thinks she should have received based on Schedule L of Western Royal's 2022 tax return. We again note that Makarenko failed to include the shareholder loans, also listed on Schedule L, in her calculations. If we accepted Makarenko's argument, her resulting equalization payment would likely be less than what Makarenko contends.

c.     Mahmud's business withdrawals

Makarenko contends that the trial court erred when it declined to divide distributions Mahmud took from the businesses' bank accounts during the dissolution proceedings. Makarenko insists she should receive half of everything Mahmud has withdrawn from the business bank accounts, after deduction of the spousal maintenance she has already received. Makarenko estimates that Mahmud withdrew over $2.4 million from the businesses, pointing to bank statements found in Exhibits 157 and 159.

During trial, Makarenko testified that Mahmud took regular draws from the Mulino and Western Royal business bank accounts from the time he petitioned for dissolution of the marriage up through 2023. However, Makarenko did not identify with any specificity when Mahmud's withdrawals were for personal or business purposes. When addressing business distributions, the trial court stated:

> And then as to the distributions, it's very challenging to decipher what they were for, why they—you know, the timing that they were made. There was not . . . . I don't believe, enough time with the trial time we had, to go line by line through all of those. And . . . so the Court had to say, Okay, . . . some or most of . . . that had to have been accounted for when it came time to do these appraisals. And that's—that's kind of where we got there.
>
> In . . . terms of thinking about all of that together, that's why I'm giving you, kind of, these very rough numbers. I did try my best to put in and use my own spreadsheet to arrive at exact figures. But because of all of that, I'm using, kind of, . . . round figures in that respect. So I'm not making any specific increases to value, based on the movement in the accounts. I guess it's a long, long way of saying, I'm not . . . giving that any specific weight.

3 VRP (Feb. 16, 2024) at 1363.

Here, Exhibits 157 and 159 constitute *nearly 900 pages* of bank statements from Chase and Wells Fargo, respectively. As the trial court noted, it is near impossible to determine what each

withdrawal was for, whether it was a business or personal expense, or as Mahmud argues in his brief, a withdrawal to make a support payment to Makarenko or for other family expenses. Indeed, during trial, Mahmud testified that he had made monthly payments of $7,500 to Makarenko beginning in 2019. Additionally, Mahmud paid all expenses related to S.M. and the Ridgefield house. Not only that, Mahmud also paid for Makarenko's out of pocket health expenses.

Trial courts have broad discretion to dispose of property based on consideration of "all relevant factors." RCW 26.09.080. Moreover, a "just and equitable" distribution does not require mathematical precision. *Larson*, 178 Wn. App. at 138. Based on the testimony regarding Mahmud's family support expenses and the inability to determine what exactly Mahmud's bank withdrawals were for (business or personal), we hold the trial court did not abuse its discretion when it declined to give the withdrawals "any specific weight" or incorporate them into Makarenko's equalization payment.

2.    Ukraine Apartments Rental Income

Makarenko argues the trial court abused its discretion when it applied a $90,000 offset against her equalization payment based on rents collected from the Ukraine apartments. Specifically, Makarenko asserts that there was no legal basis or substantial evidence to award Mahmud $90,000 based on past rental income generated since 2010. We disagree.

Here, the record shows that Makarenko's mother and brother managed both apartments. Mahmud testified that the apartments were rented out between 2010 and 2020, and generated $1,500 per month in rental income, or approximately $180,000 total over the course of 10 years. According to Mahmud, he never saw or had access to that rental income. According to Makarenko, her mother sent her and Mahmud cash for the rental income, some of which Makarenko used for

a family trip to Thailand. In 2020, Mahmud asked Makarenko about the $180,000 of rental income and Makarenko replied that he still possessed her $168,800, implying they could call it a wash. Makarenko never offered evidence of, nor does she argue in her brief, a competing value for rental income. While the apartments were valued at approximately $300,000 in 2020 or 2021, the record does not contain any more recent valuations, and, in light of the ongoing war in Ukraine, the apartments may be worth little to nothing.

The trial court valued the apartments at $180,000 based on testimony of the rental income the apartments once generated. The trial court also found that Makarenko likely solely received that rental income, and based on the community property characterization of the apartments,[18] Mahmud was entitled to a $90,000 offset, or 50 percent of the $180,000.

These findings are supported by substantial evidence in the record. *Byerley*, 183 Wn. App. at 685. Makarenko challenges the trial court's decision to value the apartments based on rental income beginning in 2010 and argues that it "was unclear whether the figure was gross or net rents, who had actually received the rents, what expenses or taxes were paid and whether expenses paid for maintenance on the apartments were ever reimbursed." Br. of Appellant at 25. However, as described above, Mahmud testified that the apartments generated rent from 2010 to 2020. Mahmud never saw the rental income; thus, it is reasonable to infer either Makarenko or her family possessed the rental income. Moreover, when Mahmud asked Makarenko about the rental income in 2020, she responded that he possessed her $168,800 loan, implying that it was comparable to the amount of rental income received from the two apartments.

---

[18] Makarenko does not dispute the trial court's characterization of the Ukraine apartments as community property.

Trial courts have broad discretion to determine what is just and equitable based on the facts of each case. *Doneen*, 197 Wn. App. at 949; *see generally* RCW 26.09.080. Trial courts need not engage in mathematical precision or make equal distributions. *Larson*, 178 Wn. App. at 138. Equitable distributions are based on notions of fairness, given all the circumstances. *Id.* Considering the trial court split the value of the apartments 50/50 between Mahmud and Makarenko, the trial court distributed the assets as justly and equitably as it possibly could have.

Because substantial evidence supports the value assigned to the Ukraine apartments and because courts have broad discretion to determine what is just and equitable, we hold that the trial court did not abuse its discretion when it applied a $90,000 offset against Makarenko's equalization payment.

3.      $168,800 Loan

Makarenko argues that the trial court abused its discretion when it "refused to find that the [$168,800] are Ms. Makarenko's separate property and should be repaid." Br. of Appellant at 27. Mahmud argues that Makarenko "waived her claim for repayment by not enforcing the loan within the statute of limitations" and the trial court could "presume that the loan was a gift to the community." Br. of Resp't at 58. We agree with Makarenko.

The trial court declined to require repayment of the $168,800 loan to Makarenko. The trial court stated that Makarenko made the loan "to an MKT Investments. And . . . from the evidence supplied, the Court finds that those funds were . . . largely, if not entirely, used to benefit the community." 3 VRP (Feb. 16, 2024) at 1343.

Here, the record shows that in 2008, Makarenko gave Mahmud $168,800 and they executed a promissory note. The promissory note was between MKT and Makarenko. However, Mahmud

testified that Hasan objected to MKT holding the funds, so Mahmud deposited the funds into his individual checking account instead. The record contains the U.S. Bank withdrawal and deposit slips evidencing Makarenko's withdrawal of the funds from her individual account and Mahmud depositing them into his individual account. Indeed, neither Mahmud nor Makarenko dispute the fact that the $168,800 belonged to Makarenko from prior to marriage. Rather, they dispute why Makarenko transferred the $168,800 to Mahmud. Regardless, Mahmud clearly stated that the $168,800 remained in a bank account, untouched, at the time of trial. Therefore, between the testimony and documentary evidence, there is clear and convincing evidence that the $168,800 constitutes Makarenko's separate funds. *Schwarz*, 192 Wn. App. at 189.

Mahmud contends that the trial court did not abuse its discretion when it determined that the funds were largely used to benefit the community because "to the extent the funds were deposited into [his] personal account, they had been commingled with community funds and there was no evidence these funds still existed in any account." Br. of Resp't at 60. However, Mahmud's contention is belied by his own testimony. Mahmud clearly stated that the funds had *not* been used to benefit the community and, *according to Mahmud*, the funds still sat untouched in a bank account as of the trial date. Thus, the trial court's finding that the funds were used to benefit the community is not supported by substantial evidence.

Mahmud also argues that Makarenko allowed her claim to lapse under the Oregon statute of limitations[19] for actions regarding payment of notes, therefore negating any obligation of

---

[19] The terms of the promissory note stated: "Venue for any action to enforce this note shall lie exclusively in Multnomah County, Oregon. This note shall be construed under the laws of Oregon." Ex. 152.

Mahmud to repay the loan. Mahmud also asserts that the trial court could infer that Makarenko intended the funds as a gift to the community because she never requested repayment.

First, this is not a contract action. Moreover, Makarenko does not raise a claim based on the terms of the promissory note.[20] In dissolution proceedings, "[a]ll property is before the court for distribution." *Larson*, 178 Wn. App. at 137. Thus, any argument regarding a statute of limitations is unpersuasive. Second, while the trial court could infer Makarenko intended the $168,800 as a gift because she never requested repayment, there is direct evidence in the record that Makarenko did *not* intend the $168,800 as a gift, regardless of whose version of events is to be believed.

Because the record contains clear and convincing evidence that the $168,800 constitutes Makarenko's separate funds and because the trial court's finding that the funds were used to benefit the community is not supported by substantial evidence, we hold the trial court erred when it did not allow an offset or reimbursement to Makarenko for the $168,800.

4.      Pavel's Tile Settlement

Makarenko argues the trial court erred when it ordered that her equalization payment should be reduced by one half the amount of the Pavel's Tile settlement proceeds, or by $47,500. Makarenko asserts that in doing so, the trial court effectively awarded Mahmud 100 percent of the Pavel's Tile settlement proceeds, which was contrary to the prior stipulation that the settlement proceeds should be split equally. We agree.

---

[20] We note that the promissory note appears to have been faulty from its inception in that it was made between MKT and Makarenko, but Mahmud testified that Hasan and MKT refused to be involved and MKT never held the funds.

The record shows that Mahmud and Makarenko received $95,000 in settlement proceeds following their lawsuit against Pavel's Tile. During the dissolution proceedings, the trial court originally ordered that the settlement proceeds be distributed in full to Makarenko. Mahmud and Makarenko later stipulated to splitting the proceeds equally between the two of them, which the trial court approved and then entered an order to disburse the funds from the attorney trust account. Subsequently, the trial court ordered that Mahmud pay $47,500 to Makarenko for attorney fees based on the fact that Mahmud had access to $47,500 from the Pavel's Tile settlement. Mahmud then paid Makarenko $47,500 in attorney fees.

During the dissolution proceedings, the trial court stated: "the Court has already, in temporary orders, granted [the Pavel's Tile settlement] to be dispersed to Ms. Makarenko. But as the Court has found the home to be community, half of that should be . . . reducing Mr. Mahmud's equalization payment [to Makarenko]. So . . . by my math, that's 47,500." 3 VRP (Feb. 16, 2024) at 1343. The trial court appears to have referenced its original order, from August 2023, distributing the entirety of the Pavel's Tile proceeds to Makarenko. The trial court did not mention Mahmud's and Makarenko's September 2023 stipulation to split the proceeds equally.

Mahmud argues that even though he received his half of the Pavel's Tile settlement, he was ordered by the trial court to turn over his half to Makarenko to pay her attorney fees. He further asserts that for the trial court to give him credit for the attorney fee payment to Makarenko was well within its discretion, and that this court "must infer" the ultimate judgment awarded to Makarenko was a conscious choice based on the trial court's attempt to arrive at a just and equitable distribution. Br. of Resp't at 62.

43

Here, it appears the trial court's decision to credit Mahmud $47,500 was based on the August 2023 order disbursing the Pavel's Tile settlement proceeds entirely to Makarenko. However, the record shows that Mahmud and Makarenko later split the settlement proceeds equally. Indeed, Mahmud concedes this fact. The fact that Mahmud subsequently paid Makarenko's attorney fees in an amount equivalent to what he received from the Pavel's Tile settlement is, in some regard, a separate issue.[21] Mahmud was not ordered to pay his *specific* portion of the Pavel's Tile settlement for Makarenko's attorney fees—the trial court had merely noted that he had access to cash based on those proceeds, not that he must use those proceeds. The trial court makes no mention of Mahmud paying Makarenko's attorney fees in its ruling. Thus, the trial court's ruling that Mahmud should be credited half the Pavel's Tile settlement proceeds based on the August 2023 order dispersing funds entirely to Makarenko is not supported by substantial evidence. Therefore, the trial court abused its discretion in crediting Mahmud $47,500 against Makarenko's equalization payment.

D.      PARENTING PLAN AND CHILD SUPPORT

1.      Legal Principles

Appellate courts review parenting plans for abuse of discretion. *In re Marriage of Underwood*, 181 Wn. App. 608, 610, 326 P.3d 793, *review denied*, 181 Wn.2d 1029 (2014); *accord Littlefield*, 133 Wn.2d at 51-52 ("In developing and ordering a permanent parenting plan, the court is given broad discretion.").

---

[21] In dissolution proceedings, courts have the discretion, after consideration of the parties' financial circumstances, to order one party to pay the other's attorney fees such that both parties can maintain and defend the suit. RCW 26.09.140. Mahmud does not appeal the award of attorney fees.

Generally, a permanent parenting plan should:

> (a) Provide for the child's physical care;
> (b) Maintain the child's emotional stability;
> (c) Provide for the child's changing needs as the child grows and matures, in a way that minimizes the need for future modifications to the permanent parenting plan;
> (d) Set forth the authority and responsibilities of each parent with respect to the child, consistent with the criteria in RCW 26.09.187 . . . ;
> (e) Minimize the child's exposure to harmful parental conflict;
> (f) Encourage the parents, where appropriate under RCW 26.09.187 . . . to meet their responsibilities to their minor children through agreements in the permanent parenting plan, rather than by relying on judicial intervention; and
> (g) To otherwise protect the best interests of the child consistent with RCW 26.09.002.

RCW 26.09.184(1). "[T]he best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities." RCW 26.09.002.

A trial court shall order sole decision-making authority for one parent if it finds that "[b]oth parents are opposed to mutual decision making" or "[o]ne0 parent is opposed to mutual decision making, and such opposition is reasonable based on the criteria" found in RCW 26.09.187(2)(c). RCW 26.09.187(2)(b)(ii)-(iii). In allocating decision-making authority, courts consider several factors, which include:

> (ii) The history of participation of each parent in decision making in each of the areas in RCW 26.09.184(5)(a);
> (iii) Whether the parents have a demonstrated ability and desire to cooperate with one another in decision making in each of the areas in RCW 26.09.184(5)(a); and
> (iv) The parents' geographic proximity to one another, to the extent that it affects their ability to make timely mutual decisions.

RCW 26.09.187(2)(c).

Trial courts also determine a minor child's residential schedule based on various factors:

(i) The relative strength, nature, and stability of the child's relationship with each parent;

(ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;

(iii) Each parent's past and potential for future performance of parenting functions as defined in []RCW 26.09.004(2), including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;

(iv) The emotional needs and developmental level of the child;

(v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;

(vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and

(vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.

Factor (i) shall be given the greatest weight.

RCW 26.09.187(3)(a).

Child support orders are also reviewed for abuse of discretion. *In re Marriage of Condie*, 15 Wn. App. 2d 449, 472, 475 P.3d 993 (2020).

In establishing a child support schedule, the legislature intends "that child support orders are adequate to meet a child's basic needs and to provide additional child support commensurate with the parents' income, resources, and standard of living." RCW 26.19.001. Courts consider all income and resources of each parent to determine the parent's child support obligation. RCW 26.19.071(1). Generally, a parent's income is verified through tax returns for the preceding two years and current paystubs. RCW 26.19.071(2). "Other sufficient verification shall be required for income and deductions which do not appear on tax returns or paystubs." RCW 26.19.071(2). "A trial court's failure to include all sources of income not excluded by statute is reversible error." *In re Marriage of Bucklin*, 70 Wn. App. 837, 840, 855 P.2d 1197 (1993).

The trial court's findings of fact are treated as verities on appeal so long as they are supported by substantial evidence. *In re Marriage of Bundy*, 12 Wn. App. 2d 933, 937, 460 P.3d 1111 (2020). "'Substantial evidence' is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted." *In re Marriage of Chandola*, 180 Wn.2d 632, 642, 327 P.3d 644 (2014) (quoting *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012), *cert. denied*, 568 U.S. 1090 (2013)).

2.      Education and Healthcare Decisions

Makarenko assigns error to the trial court's final parenting plan naming Mahmud as the sole decisionmaker for S.M.'s education and healthcare decisions. Specifically, Makarenko argues that the trial court's decision was not supported by substantial evidence and should be stricken.

During trial, Makarenko proposed a complicated month-on/month-off living arrangement for S.M., which amounted to a 50/50 residential split between Mahmud and Makarenko. Makarenko's intention was that during the months S.M. resided with Mahmud, Makarenko would travel to Europe to care for her aging parents—specifically, she intended to be abroad four months out of the year. The record also shows that Mahmud did not wish to share decision-making with Makarenko.

In the final parenting plan, the trial court granted Mahmud sole decision-making authority for S.M.'s healthcare and education decisions, stating: "One of the parents does not want to share decision-making and this is reasonable because of: geographic distance between the parties [and] [t]he history of each parent's participation in decision-making." CP at 58. During its oral ruling, the trial court clarified its decision was in part due to Makarenko's intention to be abroad for a significant portion of the year. The trial court stated: "[S]ay, if [S.M.] tests, you know, advanced

placement and gets to skip a grade, if [Makarenko] is in Spain, and you need to make a decision, somebody's got to be here to make that call. I want [Mahmud] to be able to do that." 3 VRP (Feb. 16, 2024) at 1361.

As noted above, trial courts have broad discretion when determining a parenting plan. *Littlefield*, 133 Wn.2d at 51-52. In allocating decision-making authority, courts consider several factors, which include the parents' geographic proximity to one another, "to the extent that it affects their ability to make timely mutual decisions." RCW 26.09.187(2)(c)(iv).

Makarenko argues that "modern technology" would allow her to "instantly communicate . . . when it comes to major healthcare and educational decision[s]" if she happened to be abroad. Br. of Appellant at 35. Here, the record contains evidence that Makarenko intends to be in Spain a significant portion of the year. Even with modern communication technology, it follows that if Makarenko is in Spain when a major education or healthcare decision for S.M. needs to be made, Mahmud and Makarenko may have difficulty making "timely mutual decisions" simply due to the difference in time zones. RCW 26.09.187(2)(c)(iv). It may be unrealistic and impractical for Mahmud to seek Makarenko's approval in every single instance, particularly when, as the trial court noted, a decision needs to be made. Thus, there is substantial evidence that geographic distance between the parties supports sole decision-making allocated to one parent.

Makarenko also argues there was no testimony regarding her history of participation in decision-making; thus, it was error for the court to cite that as a reason for designating Mahmud as the sole decisionmaker. However, and as Mahmud points out in his brief, the record contains evidence that Mahmud was the parent primarily responsible for taking S.M. to doctor and dental appointments. Mahmud also testified that he attended all of S.M.'s teacher-parent conferences. In

contrast, Makarenko had not recently attended teacher-parent conferences for S.M. Makarenko acknowledged that Mahmud was the parent who coordinated dental appointments and orthodontic appointments for S.M.'s braces. Makarenko did not recall the last time she attended a doctor appointment with S.M. at S.M.'s primary care provider. Thus, the record contains substantial evidence that Mahmud is the parent more involved in S.M.'s healthcare and education needs. *See* RCW 26.09.187(2)(c)(ii).

Accordingly, because the record shows Makarenko intends to be abroad for a significant portion of the year, Mahmud was already primarily responsible for S.M.'s healthcare and education needs, and because trial courts have broad discretion in fashioning parenting plans, we hold that the trial court did not abuse its discretion when it awarded Mahmud sole decision-making authority in those areas.

3.    Travel

Makarenko challenges the trial court's travel "limits" on her residential time with S.M. Br. of Appellant at 37. Specifically, Makarenko argues there is "virtually no evidence" regarding why any travel restriction is necessary and asserts that the trial court did not issue any findings as to why or how the restrictions were in S.M.'s best interests. Br. of Appellant at 37.

Mahmud argues that Makarenko's briefing misstates the trial court's order. Mahmud contends that, in context, the limitations are not unreasonable and apply only during the school year. Moreover, the trial court provided findings on the topic. We agree with Mahmud.

Here, in the final parenting plan for S.M.'s *school* schedule, the trial court ordered:

> [S.M.] is scheduled to live with each parent on a week-on/week-off basis with exchanges on Sunday at 5:00 p.m. If Mother travels to Spain or is otherwise more than fifty (50) miles away from Father's residence for forty-eight (48) hours or

longer during her residential time, then the child shall reside with Father, unless the parents agree otherwise, in writing; agreement shall be reasonable and account for extracurricular activities or short weekend trips. [A]ny such absences shall be communicated to Father at least seventy-two (72) hours in advance.

CP at 59. This schedule does not apply during the summer. During its oral ruling, the trial court stated that the "overriding interest is what is in [S.M.]'s best interest." 3 VRP (Feb. 16, 2024) at 1347. The trial court then walked through each of the factors under RCW 26.09.187(3)(a). The trial court noted its concern about Makarenko's proposed residential schedule. Specifically, the trial court stated:

> While the Court is absolutely sympathetic to [Makarenko's] desire and her need to help and care for her aging parents, arranging a schedule for a 13-year-old child, that's tied to her mother's travel plans in and out of the country, is not in [S.M.]'s best interest.

3 VRP (Feb. 16, 2024) at 1351. Additionally, the trial court clarified that the restriction, which is only applicable during the school year, was not intended to restrict "extracurricular activities or short weekend trips." 3 VRP (Mar. 7, 2024) at 1382.

Makarenko cites to *Underwood* and argues that courts must enter detailed findings in a "decision before potentially eliminating a parent's residential time with the child." Br. of Appellant at 38. However, *Underwood* is not analogous to the case here. In *Underwood*, this court held that the trial court abused its discretion when, without appropriate findings under RCW 26.09.191, it allowed the children to choose whether they had residential time with their father, which effectively eliminated the father's residential time altogether. 181 Wn. App. at 612.

First, RCW 26.09.191[22] is not applicable, nor does either party argue it is applicable. Here, the trial court did not eliminate or effectively eliminate Makarenko's residential time with S.M. Indeed, the parenting plan provides that Makarenko and Mahmud share 50/50 custody of S.M. The record shows that the 50/50 custody arrangement is what Mahmud and Makarenko both requested, albeit different in execution. Further, because the limitation applies during the school year and not during summers, it only limits Makarenko's ability to very suddenly and unilaterally take S.M. out of school for extended periods of time. Moreover, trial courts have authority and discretion to include "reasonable terms or conditions that facilitate the orderly and meaningful exercise of residential time by a parent." RCW 26.09.187(3)(c). If Makarenko wishes to take S.M. out of school for a trip, she is not prohibited—she merely needs to coordinate with Mahmud in writing, which is not unreasonable.

Because the record shows that trial court found it was not in S.M.'s best interest to have her residential schedule dictated by Makarenko's international travel plans, that Makarenko intended to travel abroad extensively, and because the travel limitations apply only during the school year or with coordination with Mahmud, we hold the trial court did not abuse its discretion in fashioning the residential provisions challenged by Makarenko.

4.    Child Support

Makarenko argues that the trial court's child support order does not include all of Mahmud's sources of income and is thus reversible error. Makarenko requests that this court reverse and remand to the trial court to "determine Mr. Mahmud's true actual income." Br. of

---

[22] RCW 26.09.191 addresses restrictions in parenting plans in cases of abandonment, child abuse, domestic violence, and sexual assault.

Appellant at 40. Mahmud argues that the trial court properly based his income on evidence presented at trial. We agree with Mahmud.

Makarenko objects to the trial court's adoption of Mahmud's suggested way to determine his income, which was to add together his verified expenses of family support payments, the Ridgefield house mortgage, and health insurance payments. The trial court noted it was a "creative way" to determine Mahmud's income, but absent paystubs, there was no other evidence to determine Mahmud's exact income. 3 VRP (Feb. 16, 2024) at 1353.

The trial court's finding is supported by the record. Mahmud testified that Mulino and Western Royal were his only sources of income. Both Mahmud and Burback testified that Mulino and Western Royal were encumbered with various debts. The record also shows that Mahmud heavily relies on his businesses' revolving lines of credit to pay expenses. During trial, Mahmud also discussed his individual tax returns,[23] which showed adjusted gross incomes of $45,947 for 2019, $19,462 for 2020, and $36,485 for 2021.

Makarenko asserts that Mahmud's 2022 bank statements show that he withdrew almost $1 million from his business bank accounts. While Makarenko does not directly state this, the implication of her argument is that Mahmud's income is far greater than the trial court designated on the child support order. However, as discussed in Section C.1.c above, it is almost impossible to determine what Mahmud's business withdrawals were for—whether it was a business or personal expense, or a withdrawal to make a support payment to Makarenko or for other family expenses. Moreover, Makarenko does not offer or point to other sources of Mahmud's income

---

[23] Mahmud's personal tax returns were not designated in the record on appeal.

outside Mulino or Western Royal. The record also shows that Mahmud was consistently able to make monthly support payments to Makarenko, as well as payments for other expenses related to Makarenko and their child, during the pendency of the proceedings. Mahmud did so utilizing the businesses' revolving lines of credit. This makes sense, given that the income reflected on his individual tax returns would not support a monthly net income figure in excess of $10,000. Thus, to add together Mahmud's "verified expenses" of family support, mortgage, and healthcare expenses, which actually far exceed what would be his monthly take-home pay based on his individual tax returns, is not unreasonable. *Bucklin*, 70 Wn. App. at 840.

Because the record shows that Mulino and Western Royal are Mahmud's only sources of income, that Mahmud's expenses exceeded his income reported in his individual tax returns, and because there is insufficient information regarding Mahmud's business bank account withdrawals, the trial court did not abuse its discretion when it calculated Mahmud's income based on the expenses he paid towards family support, mortgage, and healthcare expenses. *Condie*, 15 Wn. App. 2d at 472 (stating appellate courts "review the [trial] court's child support decision for abuse of discretion").

E.     JUDGE BIAS

Makarenko requests reassignment to another judge in the event we remand to the trial court. Makarenko argues that the trial court was biased in favor of Mahmud because it accepted almost all of Mahmud's settlement proposals "regardless of whether they were supported in fact or in law." Br. of Appellant at 41. We decline Makarenko's request.

Parties are guaranteed the right to an impartial judge. *In re Marriage of DeVogel*, 22 Wn. App. 2d 39, 57, 509 P.3d 832 (2022). However, a party "must submit proof of actual or perceived

bias to support a claim of appearance of impartiality." *In re of Marriage of Rounds*, 4 Wn. App. 2d 801, 808, 423 P.3d 895 (2018). We presume the trial court "perform[s] its functions regularly and properly without bias or prejudice." *In re Marriage of Meredith*, 148 Wn. App. 887, 903, 201 P.3d 1056, *review denied*, 167 Wn.2d 1002 (2009). "A finding that a party lacks credibility does not mean the judge is biased." *Rounds*, 4 Wn. App. 2d at 808.

Makarenko does not offer any evidence or proof to support her claim that the judge was partial other than the fact that the judge accepted many of Mahmud's proposals for dividing assets and in the parenting plan. First, Makarenko's contention that the trial court adopted all of Mahmud's proposals is not true. For instance, Mahmud requested that the trial court order Makarenko to complete anger management courses, which the trial court declined to do. Mahmud also requested that the Ridgefield house, Mulino, Western Royal, and the Ukraine apartments all be characterized as separate property. The trial court did not do that. Rather, the trial court found that these assets were community property, for which Makarenko received equalization payments. Indeed, Makarenko neglects to acknowledge she received nearly $500,000 in equalization payments at the conclusion of trial. It is clear from the record that the trial court put forth genuine effort to parse through highly convoluted assets against a backdrop of complicated family dynamics to come to as equitable an outcome possible. Thus, because Makarenko presents no evidence of bias other than her disagreement with the trial court's rulings, we decline to order the case to be remanded to a new judge.

CONCLUSION

We affirm in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion. Because Makarenko offers no evidence of judicial bias, we decline to assign a new judge on remand.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Cruser, C.J.

Price, J.